Filed 3/10/17

**<u>CERTIFIED FOR PARTIAL PUBLICATION</u>**\*


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT


| | |
|---|---|
| In re Hannah D. et al., Persons Coming Under the Juvenile Court Law. | |
| TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TRAVIS H.,<br><br>Defendant and Appellant. | F074143<br><br>(Tulare Super. Ct. Nos. JJV068732A–D)<br><br>**OPINION** |


APPEAL from a judgment of the Superior Court of Tulare County. Robert Anthony Fultz, Judge.

Jesse F. Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

Kathleen Bales-Lange, County Counsel, John A. Rozum and Abel C. Martinez, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II. of the Discussion.

**Events Preceding the Commencement of the Dependency Case**

Tristan H. was born to Cheyenne J. and appellant Travis H. on January 14, 2015. He tested positive for methadone and was exhibiting "severe withdrawal symptoms commonly associated with being a drug exposed infant."

Travis and Cheyenne have two other children together: Jonathan H. and Christopher H. Cheyenne also has an older child, Hannah D., whose father was Casey D. Casey D. was not involved in Hannah D.'s life and his whereabouts were unknown.

A social worker met with Cheyenne on February 2, 2015.[1] Cheyenne was living with Hannah D.'s paternal grandfather, Rocky J. Rocky had cared for Hannah D. since she was two years old. Rocky would sometimes watch the other children for Cheyenne, but did not do so full time.

Cheyenne admitted to the social worker that she had a history of methamphetamine use and had entered a methadone program when she was three months pregnant with Tristan.

Cheyenne told the social worker that Rocky had "kicked [Travis] out of their home" on February 1, 2015, "due to the family issues and Travis doing nothing to help out with the care of the children." The social worker tried to contact Travis on multiple occasions, leaving messages on his cell phone. His whereabouts remained unknown until March 13, 2015.

On March 9, 2015, Cheyenne "went to criminal court in regards to her old warrants and drug use. She was ordered to be on formal probation, start a court ordered drug program, and lower her doses of methadone." A social worker met with Cheyenne after the criminal hearing and noted she was "on [her] methadone prescription and appeared to be slightly disoriented, her speech was slurred and thought process was a little delayed." Cheyenne admitted she was overwhelmed with her current situation.

---

[1] The detention report says February 2, 2014, but context indicates it should have read, February 2, 2015.

2.

Also on March 9, 2015, a doctor from the hospital where Tristan was still being treated called the social worker to express concern at the possibility of the child going home with Cheyenne. Cheyenne had only visited two times in the past two months, and Travis had not visited at all. Hospital staff expressed concern over not being able to work with Cheyenne with respect to the proper care of Tristan.

On March 11, 2015, Cheyenne agreed to a voluntary family maintenance case. She was scheduled for "couplet care" of Tristan at the hospital. "Couplet care was for the mother to spend the night with the child Tristan and receive hands on education along with monitoring the mother's ability."

The next day, hospital staff called the social worker to inform her that Cheyenne's performance at couplet care was inadequate. Tristan had cried for seven minutes and could be heard by hospital staff from outside the room. Yet, Cheyenne did not wake up until hospital staff roused her. After Cheyenne began to feed Tristan, she again fell asleep with Tristan in her arms. The social worker called Cheyenne and advised her to do a second night of couplet care to show she is able to care for Tristan. She did not show up for couplet care and called hospital staff saying she could no longer attend couplet care.

Tristan ultimately spent 55 days in the NICU.

On March 11, 2015, Tulare County Child Welfare Services (CWS) received a referral alleging Travis was intoxicated while on vacation with three-year-old Jonathan H.[2] The referral alleged Travis, who smelled heavily of alcohol, "became violent in front of the child." Travis denied the allegation and said he was trying to break down a door to get into a bedroom where his mother and Jonathan were. Travis claimed he was concerned about his mother because she had had a mild heart attack in the past.

CWS detained Tristan on March 13, 2015.

_____

[2] Information from this incident came from CWS's jurisdiction/disposition report.

3.

**Commencement of Dependency Case**

On March 17, 2015, CWS filed a juvenile dependency petition concerning all four children. At the time, Hannah D. was six years old, Jonathan H. was three years old, Christopher H. was 11 months old, and Tristan H. was two months old.

The petition alleged Tristan had tested positive for methadone and had exhibited "severe withdrawal symptoms commonly associated with being a drug exposed infant." It further alleged Cheyenne's substance abuse rendered her unable to care for the four children. CWS also claimed that Travis knew or should have known of Cheyenne's substance abuse and failed to protect the children. CWS did not detain Hannah,[3] Jonathan or Christopher at that time.

The detention report indicated that Travis associates with skinheads and has white supremacist tattoos. The report also contained the following notations pertaining to Travis:

> "SUSTAIN Tulare County Superior Court Sustain system showed history of ten criminal court cases that were filed from 2002 to 2014. The most recent charges (459PC Burglary, 496aPC Receive/Etc Known Stolen Property, 594aPC Vandalism, 667.5(b)PC Special Allegation Prior Prison) were from 06-08-14 and not guilty plea was entered 09-09-14 - next hearing: 03-16-15 for Preliminary Setting. [¶] … [¶]

> "ADSI Tulare County Sheriffs Office Jail Management system (ID# 278320) - Subject has history of eighteen bookings from August 2014 back to December 2000.

> "Charges included 459PC Burglary, 496aPC Receive/Etc Known Stolen Property, 594aPC Vandalism, 10851aVC Auto Theft, 496dPC Buy/Receive Stolen Vehicle, 14601.1VC Drive while License Suspended, 466PC Possess Burglary Tools, 470PC Forgery, 484e(b)PC Theft, 11561HS Proceeding for Parolee Addict, 3056PC Violation of Parole, 148PC Resisting Arrest, 11550aHS Use/Under the Influence of Controlled Substance, 4140BP Unauthorized Possession of Hypodermic Needle/Syringe,11364HS Possess Controlled Substance Paraphernalia, 11350aHS Possess Narcotic Controlled Substance, 23153aVC DUI with

---

[3] Hannah's father, Casey D., could not be located.

4.

Injury, 475PC Possess Forged Instrument, 4150BP Obtain Hypodermic Needle/Syringe by Fraud, 11357aHS Possess Concentrated Cannabis."

At the detention hearing on March 18, 2015, the court ordered Tristan detained. The court granted Cheyenne and Travis supervised visitation for two hours, three times per week with Tristan. The court also ordered Cheyenne not to breastfeed Tristan.

On March 25, 2015, the social worker referred Travis for an alcohol and other drug (AOD) assessment and random drug testing. Travis signed both referrals.

On March 26, 2015, social workers met with Travis. Travis was living with his mother, grandmother and Jonathan.

Travis said Jonathan had been "born exposed to marijuana." As a result, Travis had already completed parenting education and a class about drug-exposed infants. A social worker explained that while he had completed those services in the past, CWS believed the same "issues" continued to exist. Travis said he agreed and was willing to address CWS's concerns.

Travis said he began using marijuana in high school. At the age of 22, he suffered a head injury, which resulted in him experiencing several seizures a day. Because of the head injury, he does not remember much of his life between the ages of 22 and 27. However, he did admit to using methamphetamine, heroin and prescription drugs. Travis claimed that when Jonathan was born, he quit using. After a recent hospitalization, he was prescribed morphine and other opiates. He did not want to take those medications and therefore sought methadone treatment. Travis stopped the methadone treatment on his own.

Travis claimed he was not aware of Cheyenne's drug use.

A social worker provided Travis with a monthly bus pass at the March 26, 2015, meeting. The social worker also submitted a referral for a mental health assessment and advised Travis a clinician would be contacting him to set up the assessment. Travis indicated he understood.

5.

Also on March 26, 2015, the social worker referred Travis to an in-home parenting class through family services and to respite care through Parenting Network to assist with childcare needs "and to support the completion of his services." Travis's grandmother also said she would help Travis with his childcare needs so he could commence services.

On March 30, 2015, neither Cheyenne nor Travis showed up for a scheduled visitation with Tristan.

The jurisdiction/disposition report signed March 31, 2015, indicated Tristan was still suffering from methadone withdrawals and required 24-hour care.

On April 7, 2015, Cheyenne told a social worker that, as a result of a drug court hearing the previous day, she was required to rapidly detox from methadone so that she could start testing and begin a counseling program. Cheyenne admitted to relapsing on April 5, 2015, by "smoking a few puffs of Meth." The children were with their paternal grandmother at the time.

**Jurisdiction Hearing**

At the jurisdiction hearing on April 17, 2015, Cheyenne and Travis each waived their rights and submitted on the petition and reports. Some of the allegations in the petition were amended to reflect Cheyenne had been on prescription methadone.

Travis's counsel said he had not yet begun his case plan because he was in the middle of a job that was "wrapping up." When the job was completed, Travis was prepared to begin drug testing and classes. Travis's counsel said Travis had missed visits with Tristan because of his job.

The court continued Tristan's removal from Cheyenne and Travis's custody, but stated CWS "is authorized to return the child Tristan, to the mother, once the child is physically well." Cheyenne and Travis were again granted two-hour visits with Tristan, three times per week. CWS was permitted to increase the length and frequency of the visits and to permit unsupervised and overnight visits. The court also granted visitation

to Tristan's maternal and paternal grandparents.  The court continued Cheyenne and Travis's custody of Hannah, Jonathan and Christopher.

### Supplemental Petition and Detention Report

On May 7, 2015, CWS filed a supplemental petition (Welf. & Inst. Code, § 387)[4] concerning Hannah, Jonathan, and Christopher.  The petition alleged that Travis failed to drug test seven times from March 31 to April 24, and that he had not "followed through with any court ordered services of parenting classes and counseling."  Travis claimed he had been working, but he provided no pay stubs and no one responded at the phone number he provided for his purported employer.  According to the detention report, he had not visited Tristan a single time.

The petition further alleged that Travis assaulted his mother on or around May 3, 2015.  The detention report stated that Travis had gotten into an argument with his mother, Leann, over an EBT card.  Travis assaulted Leann, causing an injury to her hand.  Jonathan was also pushed to the ground.[5]  Travis was locked out of the house, so he threw a flowerpot through a window, shattering glass into the home.  He then attempted to kick the door down while screaming and yelling.

The petition also alleged that Cheyenne had failed to drug test eight times from April 6 to April 25, and tested positive for opiates on April 15, 2015.[6]  Cheyenne had also been incarcerated for a week for noncompliance with a program ordered by drug court.

CWS had detained Hannah and Christopher on May 6 and detained Jonathan on May 7.  CWS attempted to detain Jonathan several times on May 6.  That night, Leann left a message on the social worker's phone saying the social worker was not going to

---

[4] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[5] It is not clear whether Travis pushed Jonathan directly or whether his assault on Leann resulted in Jonathan being pushed to the ground.

[6] A notation in the detention report indicates the positive test was a result of her "methadone prescription."

take her grandson.  She said, " '[Y]ou better no [*sic*] jerk this kid out of this home he is fine with his grandparents.' "  She put Jonathan on the phone and had him say, " 'You're not going to take me away.' "  She said Travis had "messed up" but was now "taken care of."[7]

When Jonathan was taken into custody, Travis sent text messages to family members saying he wanted to say goodbye because he was going to kill himself.  Visalia police were unable to locate Travis.

Leann sought placement of Jonathan, but CWS concluded such a placement would not be appropriate at the time.  As to Leann's request, the detention report observed: "There have been no steps to protect the children from the parents' ongoing substance abuse and incarceration.  Both parents reside in respective grandparents['] homes at this time [grandparents] have not shown the ability to protect the kids from the parents."

**Detention Hearing as to Hannah, Jonathan and Christopher**

At the detention hearing on May 8, 2015, the court ordered Hannah, Jonathan and Christopher detained.  The court granted semi-weekly, hour-long visits to Cheyenne and Travis.  Travis did not appear at the hearing.

**Jurisdiction/Disposition Report and Hearing**

The jurisdiction/disposition report, signed May 26, 2015, indicated that Travis had not contacted CWS since the detention hearing.[8]  Travis had still not complied with any component of his services.

The police report concerning Travis's May 3, 2015, assault of his mother was attached to the jurisdiction/disposition report.  The report indicated that a witness said Travis had "been out of control for the last several weeks and that he uses [Jonathan] as a bartering tool with his mother to allow him to reside at the residence."

---

[7] These quotations are from the detention report.

[8] The report states, "At this time the father has not availed [*sic*] himself to the agency …."  We take this to mean Travis had not been in touch with CWS.

8.

Neither Cheyenne nor Travis appeared for the jurisdiction/disposition hearing. The court found the allegations in the petition to be true. CWS was still awaiting one response to the Indian Child Welfare Act notices it had sent, and the disposition hearing was continued.

**Court-Appointed Special Advocate's (CASA) Report**

Jonathan's foster parents reported that, as of June 29, 2015, he would have "frequent temper tantrums; high pitch screaming, using foul language and he throws himself on the floor and into furniture." Tristan had severe reflux and initially needed to be held most of the time, including at night. By June 29, 2015, Tristan would sleep three to four hours without being held. Tristan was initially referred to Central Valley Regional Center, but he was dropped from that program because Cheyenne and Travis did not sign his individualized family service plan.

On July 9, 2015, the social worker held a "Team Decision Making" meeting to address placement of the children because Jonathan and Christopher's foster parents no longer wanted to care for them due to their behaviors. Cheyenne attended the meeting but "participated minimally" and "nodded off throughout the meeting." Cheyenne appeared to be "under the influence." At the meeting, it was decided that all four children would be moved into a single placement in Tulare County. Cheyenne signed releases for Tristan to begin services with Central Valley Regional Center.

On July 15, 2015, a social worker met with Travis at CWS offices. Travis said he had a criminal court hearing in one or two months "regarding receiving stolen property." Travis said he had not engaged in services or met with the social worker because he was afraid the social worker would contact law enforcement concerning "outstanding criminal warrants." The social worker said she would not contact law enforcement unless he was a threat to himself or others. She also advised Travis to clear his warrants if he wanted to reunify with the children.

9.

Travis claimed he completed a 30-day, in-patient, drug rehabilitation program but could not provide dates of entrance or completion or produce any certificate of completion. The social worker asked Travis if he would test clean if immediately drug tested. Travis said he would not test clean because he had been taking Vicodin for back pain. Travis claimed he had not used methamphetamine or heroin for approximately three years.

Travis said he was not in need of services but would participate to reunify with his children. The social worker provided Travis with several referrals: alcohol and drug assessment at Prevention Services with an appointment date of July 21, 2015, at 9:30 a.m.; parenting education; and random drug testing. With respect to parenting education, the social worker provided Travis with a list of courses and told him to choose one and bring back the certificate of completion. The report did not indicate whether Travis had done so.

The social worker requested Travis's case plan also be amended to include drug exposed infant training.

Neither Travis nor Cheyenne visited their children.

**Disposition**

Neither Cheyenne nor Travis appeared for the disposition hearing. The court ordered Hannah, Christopher, and Jonathan removed from their custody. The court found that Cheyenne and Travis had made no progress toward alleviating or mitigating the causes necessitating the children's removal. However, the court ordered family reunification services for Cheyenne and Travis.

**Status Review Report Signed September 22, 2015**

A status review report signed September 22, 2015, detailed Travis's performance with respect to his case plan.

10.

*Mental Health and Counseling*

Social workers referred Travis to CWS clinicians for a mental health assessment on March 25 and July 27, 2015.  The social worker did not have an updated progress report as to Travis's participation or lack thereof on this component of his case plan.[9]

*Parenting Classes*

Social workers provided Travis with a list of available parenting classes on July 15 and September 9, 2015, but he did not enroll in any classes.

*Substance Abuse Services*

Social workers referred Travis to a drug and alcohol assessment with Prevention Services on March 25; July 15; July 27; and September 2, 2015.  As of September 22, 2015, the social worker did not know if Travis had completed the assessment.

*Drug Testing*

Travis was a "no show" to drug testing on July 23; September 9; September 14; and September 18, 2015.  He tested positive of alcohol on September 3.  The report concluded Travis was not in compliance with this portion of his case plan.

*Visitation*

Travis was afforded 18 visits, but missed 11 of them.  The visits that he did attend were "appropriate" except on September 17, 2015, when the visit was cut short because Travis was falling asleep and appeared "either under the influence of a controlled substance or coming off of one."

**Status Review Hearing on October 7, 2015**

A status review hearing was held on October 7, 2015.[10]  The court scheduled a section 366.21, subdivision (e) hearing for Hannah, Jonathan, and Christopher for January 15, 2016, and a status review hearing for Tristan for the same date.

---

[9] Unfortunately, the social worker did not request an updated progress report until the day the status review report was written.

[10] CWS claims, and a minute order indicated, that Travis did not appear for the hearing.  But Travis's counsel stated at the hearing that he was in fact present.

11.

The court also set a section 366.21, subdivision (f) hearing for Tristan on March 23, 2016.

The court continued family reunification services for both Cheyenne and Travis.

**Status Review Report Signed December 23, 2015**

In a status review report signed December 23, 2015, CWS recommended that the court terminate all services and schedule a section 366.26 hearing.

Travis saw a clinician for a mental health appointment on October 23, 2015, but he did not contact the clinician thereafter. Travis also attended one parenting class on October 13, 2015, but then stopped attending and was dropped from the program. He was a "no show" for all nine random drug tests to occur between September 18 to November 18, 2015.[11] Travis was afforded 41 visits with the children but missed 29 of them. CWS met with Travis monthly and noted that he "has not requested any additional services."

The status review report recounted Travis's criminal history as follows:

"• 11/18/15 fresh charge - Battery w/ Serious Bodily Injury, Assault with a Deadly Weapon, Special Allegation: Prior Prison, Special Allegation: Great Bodily Injury, Vandalism, Use/Under the Influence of Controlled Substance, violation of probation Receive/Etc. Known Stolen Property.

"• 11/09/15 Use/Under the Influence of Controlled Substance, Vandalism; released - cited to appear.

"• 07/18/15 Receive/Etc. Known Stolen Property, fresh charges, Use/Under the Influence of Controlled Substance (no case filed), False Identification to Peace Officer (no case filed); released 08/28/15 - time served.

"• 12/11/15 charge date 09/20/15 Vandalism, Trespass: Injure Property; next court date 12/22/15 @ 8:30 in Department 4 for Arraignment: Complaint.

---

[11] Travis was arrested on November 18, 2015. At a subsequent hearing, CWS acknowledged that his incarceration excused his nonappearance on November 18, 2015. But CWS noted that the other no-shows remained unexplained.

12.

"• 11/20/15 charge date 11/18/15 Battery w/ Serious Bodily Injury, 4 counts Special Allegation: Prior Prison, Assault by means to produce Great Bodily Injury, Special Allegation: Great Bodily Injury; next court date 12/22/15 @ 8:30 in Department 4 for Arraignment: Complaint.

"The father is currently incarcerated at Bob Wiley Detention Facility on $90,000 bail with no projected release date set. The father has a new court date of 01/11/2016."

On, November 23, 2015, Travis said that if he failed reunification services, he would like his mother, Leann, to adopt the children. As of the writing of the status review report, Leann had not contacted CWS to discuss concurrent planning. The foster parents said they would adopt the children as a sibling set if the parents failed reunification services.

The agency filed a section 388 petition requesting the court terminate services as to Tristan. The court heard the petition at the section 366.21, subdivision (e) hearing on January 27, 2016. CWS submitted on the evidence already in the case file. Travis's counsel argued that it was in the best interest of the children to allow him to try to continue with his case plan. Travis claimed he was participating in a parenting program while in custody. He also "hoped" to be released from custody on February 18, 2016, and to engage in other services required by his case plan at that time. CWS argued that Travis's engagement with the services offered was minimal.

After the matter was submitted, the court noted that Travis had eight consecutive no-shows for drug testing, which showed "absolutely no effort whatsoever on his behalf. Absolutely none." The court further observed that Travis "made no effort regarding his services while out of custody. I understand since he's been in custody there's not much he can do about it, but while in custody he did nothing to take advantage of the services to try to reunify with these children." The court granted the CWS's petition and terminated services.

After the court ruled, Travis's counsel asked that he be granted semi-weekly visitation if he moved facilities. The CASA addressed the court and noted that when

13.

Travis and Cheyenne had repeatedly missed visitations, the children were "quite disappointed" and would say, "They don't love me anymore." The CASA said it was not a good idea to resume visitation. The court ruled that Travis would not be allowed visitation with the children while he is incarcerated, but that if his "current custodial status changes to a place where there could be contact visits" then CWS could allow one visit per month for two hours.

Travis's counsel requested that he be allowed to send correspondence, pictures and "things of that nature through the social worker." The court granted the request, so long as the correspondence were appropriate.

Later in the hearing, counsel for CWS said, "The clerk served the father writ review notice in court. He is present." Counsel further said that mother should be served at her last known address, and that the clerk should be relieved of the obligation to serve Casey D. with writ review notice because his whereabouts were unknown. The court said, "That will be the order." The minute order for the hearing said, "Notice of Necessity to Seek Writ Review forms personally served on the father, [Travis H.], in Court and orally noticed by the Court. (Info Sheet, JV-820, JV-825 forms)." Travis did not file a notice of intent to file a writ. (See Cal. Rules of Court, rule 8.450(e).)

Finally, the court scheduled a section 366.26 hearing for May 11, 2016.

**Section 366.26 Report**

Ahead of the section 366.26 hearing, Travis substituted in new counsel, Philip Bianco.

The section 366.26 report recommended termination of parental rights and selection of adoption as the permanent plan for all four children.

The report discussed Leann's attempts to get placement of the children. On July 30, 2015, a relative assessment referral was initiated for Leann. The relative assessment was denied on December 29, 2015, "because the criminal exemptions for [Leann] and her son Trevor were not completed."

14.

On March 11, 2016, Leann left a voicemail with the social worker again requesting placement of the children. On March 16, 2016, the social worker created a new relative assessment referral. A relative assessment social worker went to the home where Leann was living on April 1, 2016, to provide a criminal exemption packet for Leann and Trevor. During the inspection, Leann's mother Ruth W. identified herself as the homeowner. Ruth asked, " 'What is this for, this is only for visits right?' " The social worker said, "No." Ruth said, " 'I told [Leann] that I cannot handle the kids in my home. I am 87 years old and I can't handle it and only want visits here with the kids.' "[12] The social worker told Leann that Ruth is the homeowner and that her request would be honored. As a result, the home could not be approved for placement.

Since the January hearing, neither Cheyenne nor Travis contacted CWS to inquire about the well-being of the children.[13] And while the court had permitted Travis to send correspondence to the children at the January hearing, he had not sent any.

Leann and Ruth did visit Jonathan, Christopher and Tristan for two hours on March 24, 2016. They brought toys, Easter baskets, and McDonald's food to the visit. Jonathan and Christopher played with their toys while Tristan slept for the majority of the visit. During the visit, Jonathan kept asking about his foster mother and asked when it was time to leave. Hannah chose not to visit because her family did not love her, and they made her do "bad" things.

**Section 366.26 Hearing**

The section 366.26 hearing occurred on July 20, 2016. Travis appeared at the hearing, still in custody. Travis's counsel identified himself as the attorney for both Travis and Leann.

---

[12] The report spells Leann's name "Leigh-Ann." In this particular quotation, the name is shortened to "Leigh." Contextually, it is clear that this is a reference to Travis's mother, Leann.

[13] The report also notes that Travis did not request visits, but he was still in custody at the time.

Travis's counsel argued that Travis was "improperly eliminated and his parental rights terminated in January of this year on the basis that he had not complied with all that was required of him to reunify in that he was in custody from November of 2015 even to the present date." CWS "object[ed]" to that line of argument because "reunification services were already terminated" and that the present hearing "is not about reunification services. The issue here is permanency and whether the child should be adopted." Travis's counsel responded that he was requesting the court "reopen and reconsider its finding in light of these facts. It was obvious that he couldn't perform the reunification requirements being in custody." The court said, "As far as the reunification issue, as [CWS] pointed out, that was previously litigated. However, I will consider the comments made by Counsel today." The court then concluded "the decision made to terminate reunification was appropriate at the time and remained [*sic*] appropriate today."

Travis's counsel then requested that the court "allow the … paternal grandmother, Leann [H.], to be interviewed by the social worker so that she can be considered for an adoptive parent or, in the alternative, a guardian for the children in this matter." CWS countered that Ruth did not agree to have the children live in the home. CWS later offered an objection on the ground that Leann "is not a party to this action." Travis's counsel continued his argument, later saying, "All we're asking for at the end of this proceeding is that the Court order that the social worker redo her assessment and her investigation into [Leann's] ability to be the foster parent."

*Leann's Testimony*

Travis's counsel called Leann as a witness. Leann testified that she learned the children might possibly be placed for adoption "around March" 2016. Leann told social workers she had "no criminal history," but CWS "were seeing it differently" because she had been accused of "an assault and battery," but the charge was "deemed by the judge as disturbing the peace." Leann admitted she never turned in her criminal exemption packet to CWS.

16.

Leann's home burned down in 2015, so she was living with her mother when a social worker visited on March 11, 2016. According to Leann, the social worker said the purpose of the visit was to consider Leann for placement. The social worker inspected the home and made no complaints as to the suitability of the home. Leann's mother told the social worker that she just thought the visit was for visitation, not for permanency. However, the social worker told Leann that her request for placement was going to be denied because of what her mother had said. The social worker did not tell Leann she was out of the picture.

Leann claimed she could have rented a place apart from her mother if she had known it would disqualify her. She also said she could provide the children a permanent home and stability.

Leann testified she never missed a visit with the children. She also testified that before Tristan was born, she had daily contact with Jonathan and Christopher.

Leann testified that Travis was currently in custody for striking her, causing her to be hospitalized for broken ribs and contusions. Leann said the incident "was a one time thing." She said she would not have a problem getting a restraining order against Travis if necessary to protect the children.

*Additional Argument*

CWS argued that Leann's testimony was consistent with CWS's position: She was not able to obtain a criminal exemption and, therefore, she could not be assessed for placement. Counsel for the children argued that if they were placed with Leann, there would be "grave concerns about her ability to keep the children safe from [Travis.]"

The court terminated Cheyenne and Travis's parental rights. Travis appealed.

**DISCUSSION**

**I.     Travis's Failure to Challenge the January 27, 2016, Order Via Petition for Extraordinary Writ Precludes Review of the Order in this Appeal**

Travis seeks to challenge the court's termination of reunification services at the review hearing on January 27, 2016.  Before reaching the merits of that claim, we must address CWS's contention that Travis failed to challenge the January 27, 2016, order by writ petition and therefore cannot raise the issue on appeal from the subsequent order terminating parental rights.

**A.     Prerequisites for Appellate Review of an Order Setting a Section 366.26 Hearing**

An order setting a section 366.26 hearing is not appealable unless a petition for extraordinary writ review is timely filed.  (§ 366.26, subd. (l)(1)(A).)  "Failure to file a petition for extraordinary writ review within the period specified by rule, to substantively address the specific issues challenged, or to support that challenge by an adequate record shall preclude subsequent review by appeal of the findings and orders made pursuant to [section 366.26.]"  (§ 366.26, subd. (l)(2).)

There is no dispute that Travis did not file a timely writ review challenging the January 27, 2016, order setting the section 366.26 hearing in this case.

**B.     Notice of Writ Review Requirements**

Section 366.26 directs the Judicial Council to adopt rules of court to ensure that after a dependency court sets a section 366.26 hearing, it "shall advise all parties of the requirement of filing a petition for extraordinary writ review … in order to preserve any right to appeal.…"  (§ 366.26, subd. (l)(3)(A).)  "This notice shall be made **orally** to a party if the party is present at the time of the making of the order or by first-class mail by the clerk of the court to the last known address of a party not present at the time of the making of the order."  (§ 366.26, subd. (l)(3)(A), bold print added.)

The Judicial Council implemented California Rules of Court, rule 5.590 ("Rule 5.590"), which reads in relevant part:

"When the court orders a hearing under Welfare and Institutions Code section 366.26, the court must advise all parties and, if present, the child's parent, guardian, or adult relative, that if the party wishes to preserve any right to review on appeal of the order setting the hearing under Welfare and Institutions Code section 366.26, the party is required to seek an extraordinary writ by filing a *Notice of Intent to File Writ Petition and Request for Record (California Rules of Court, Rule 8.450)* (form JV-820) or other notice of intent to file a writ petition and request for record and a *Petition for Extraordinary Writ (California Rules of Court, Rules 8.452, 8.456)* (form JV-825) or other petition for extraordinary writ.

**"(1)    The advisement must be given orally to those present when the court orders the hearing under Welfare and Institutions Code section 366.26.**

"(2)    Within one day after the court orders the hearing under Welfare and Institutions Code section 366.26, the advisement must be sent by first-class mail by the clerk of the court to the last known address of any party who is not present when the court orders the hearing under Welfare and Institutions Code section 366.26.

"(3)    The advisement must include the time for filing a notice of intent to file a writ petition.

"(4)    Copies of *Petition for Extraordinary Writ (California Rules of Court, Rules 8.452, 8.456)* (form JV-825) and *Notice of Intent to File Writ Petition and Request for Record (California Rules of Court, Rule 8.450)* (form JV-820) must be available in the courtroom and must accompany all mailed notices informing the parties of their rights."  (Rule 5.590(b), italics and bold print added.)

At the January 27, 2016, hearing Travis was personally served with an information sheet and forms JV-820 and JV-825, notifying him of the necessity to seek writ review. However, the court did not orally advise Travis of the necessity to seek writ review as required by Rule 5.590(b)(1).[14]

_____

[14] The minute order for the hearing reads, "Notice of Necessity to Seek Writ Review forms personally served on the father, [Travis], in Court and **orally noticed by**

19.

C. Combined Effect of Travis's Failure to Challenge the January 27, 2016, Order by Writ and the Court's Failure to Orally Advise Travis of the Necessity of Seeking Writ Review Pursuant to Rule 5.590(b)(1)

There is no question that Rule 5.590(b)(1) was not followed here. We must determine whether that rule violation requires us to ignore section 366.26, subdivisions (l)(1) through (2) which would otherwise preclude appellate review without a prior writ petition.

First, we note that nothing in subdivisions (l)(1) and (l)(2) condition their applicability on compliance with the oral advisement requirement.

Second, as discussed below, the law concerning the analogous issue of remedies for statutory violations does not support the result urged by Travis.

"A statutory requirement may impose on the [government] a duty to act in a particular way, and yet failure to do so may not void the governmental action taken in violation of the duty. [Citations.] This distinction is generally expressed in terms of calling the duty 'mandatory' or 'directory.' '[T]he "directory" or "mandatory" designation does not refer to whether a particular statutory requirement is "permissive" or "obligatory," but instead simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates.' [Citation.]" (*In re Richard S.* (1991) 54 Cal.3d 857, 865 (*Richard S.*).) As *Richard S.* indicates, the distinction between "mandatory" versus "directory" concerns the remedies for violating a statute while the

---

**the Court**. (Info Sheet, JV-820, JV-825 forms)." (Bold print added.) However, the reporter's transcript does not reflect any such oral advisement. We assume the reporter's transcript is accurate. (See *Jennifer T. v. Superior Court* (2007) 159 Cal.App.4th 254, 259.)

20.

distinction between "obligatory" and "permissive" concerns whether compliance with the statute is optional.**15**

Here, it is clear that the Legislature and Judicial Council want dependency judges to *always* advise in-court parents of the necessity for writ review *orally*. (§ 366.26, subd. (l)(3)(A); Rule 5.590(b)(1).) The use of the word "shall" strongly indicates such a legislative intent. Thus, Rule 5.590(b)(1) is clearly obligatory.

But we must go a step further and determine whether the Rule 5.590(b)(1) is mandatory. That is, did the Legislature and Judicial Council intend for a violation of Rule 5.590(b)(1) to excuse compliance with the writ petition requirements of section 366.26, subdivision (l)(1) through (l)(2)? On this question, the presence of the word "shall" is not enough. (E.g., *Richard S.*, *supra*, 54 Cal.3d at pp. 865–866.) "We must go beyond the use of the term 'shall' in the rules and determine legislative intent." (*Id.* at p. 865.)

"In determining whether statutory language is mandatory or directory, ' "… the intent must be gathered from the terms of the statute construed as a whole, from the nature and character of the act to be done, and from the consequences which would follow the doing or failure to do the particular act at the required time. [Citation.] When the object is to subserve some public purpose, the provision may be held directory or mandatory as will best accomplish that purpose [citation]...." ' [Citations.]" (*Richard S.*, *supra*, 54 Cal.3d at pp. 865–866.)

Looking at the statutory scheme as a whole, two clear goals emerge: (1) expediting appellate review of orders setting section 366.26 hearings so that the review is completed before the section 366.26 hearing itself (see Cal. Rules of Court, rule 8.450(b); see also § 366.26, subds. (l)(2) & (l)(4)(A)); and (2) notifying parties of the

---

**15** Admittedly, this nomenclature can be confusing because "mandatory" and "obligatory" are relatively synonymous. However, we will use these classifications in conformity with *Richard S.*

21.

need to petition for writ review (§ 366.26, subd. (l)(3)(A); Rule 5.590(b).) Permitting appellate review of the January 27, 2016, order in the present appeal would fulfill the notification goal while completely undermining the goal of timely review before the section 366.26 hearing. In contrast, enforcing section 366.26, subdivision (l)(A)(2) – despite the dependency court's failure to comply with rule 5.590(b)(1) – would further the goal of having parties seek expedited review, while only marginally impacting the underlying goal of notice. In the present case, Travis was represented by counsel and was personally served with written notice that he must seek writ review to preserve issues for appeal. That he was not *also* given an oral advisement is regrettable and violative of Rule 5.590(b)(1); but the ultimate purpose of the rule (i.e., actual notice) was accomplished by written notice.[16]

For these reasons, we conclude that Rule 5.590(b)(1)'s oral advisement requirement is directory.[17] Consequently, a dependency court's failure to follow Rule 5.590(b)(1)'s oral advisement requirement, alone[18], does not render the requirements of

---

[16] While Rule 5.590(b)(1) clearly requires oral notice to in-court parties, rule 5.590(b)(2) requires only written notice to parties that were not present at the hearing. This demonstrates that while the Legislature intended to require oral notice be given when possible (i.e., when the party is present), it considered written notice satisfactory with respect to nonpresent parties. In other words, the Legislature did not consider written notice to be a wholly insufficient means of notice.

[17] While the Rule 5.590(b)(1) requirement is directory, it is also obligatory, in that courts must follow its dictates. Thus, it is error for a dependency court to fail to orally advise an in-court party of the necessity of seeking writ review of an order setting a section 366.26 hearing. (Rule 5.590(b)(1).) We simply hold that ignoring section 366.26, subdivisions (l)(1)(A) and (1)(2) is not the remedy for such an error.

[18] Rule 5.590(b)(1) contains the oral advisement requirement. In contrast, Rule 5.590(b) requires that the court advise all parties of the need to seek writ review without mandating the advisement be oral or written. We do not address whether Rule 5.590(b)'s broader requirement that notice be given in *some* fashion is directory or mandatory. That is, we are not faced with and therefore do not consider the consequences of a dependency court completely failing to notify a party *either* orally *or* in writing of the necessity to seek writ review. We only address whether the *oral* advisement requirement in subdivision (b)(1) is mandatory.

section 366.26, subdivisions (l)(1)(A) and (1)(C)(2) inapplicable.  As a result, Travis's challenges to the January 27, 2016, order terminating services are not cognizable in this appeal.

>    D.    Other Cases Cited by Travis do not Alter Our Conclusion

Travis cites *In re Rashad B.* (1999) 76 Cal.App.4th 442 (*Rashad B.*) in arguing that failure to provide adequate notice removes the limitations of section 366.26, subdivision (l)(1) and (l)(2).  But in *Rashad B.*, the appellant received no writ notice whatsoever because she was not present at the hearing and had no "last known address." (*Rashad B.*, *supra*, at p. 449.)  *Rashad B.* simply stated, in conclusory fashion, that "[w]here the court fails to give a party notice of writ review, the party's claims on appeal are not limited by the provisions of section 366.26, subdivision (l)(1) and (l)(2).  (See *In re Cathina W.* [(1998)] 68 Cal.App.4th [716], 722 [(*Cathina W.*)].)"  (*Id.* at p. 448.)  The circumstances of *Rashad B.* and its holding only speak to a *complete* failure of notice. (See fn. 18.)  Here, Travis received written notice.

In *Cathina W.*, we concluded that the appellant had "shown good cause for her failure" to timely file a writ petition.  (*Cathina W.*, *supra*, 68 Cal.App.4th at p. 722.)  But in *Cathina W.*, the appellant was not at the hearing and did not receive timely written notice from the dependency court.[19]  Regardless of the merits of our assumption in *Cathina W.* that there is a "good cause" exception to the statutory writ petition requirements, that case is distinguishable because it involved an appellant who did not receive timely oral *or* written notice.  (See fn. 18.)

In *Jennifer T. v. Superior Court*, *supra*, 159 Cal.App.4th 254 (*Jennifer T.*), the court directed the clerk to give *written* notice to the appellant, but the reporter's transcript showed the court did not *orally* advise the appellant of her writ rights.  (*Id.* at p. 259.)

---

[19] Written notice was eventually sent by the court clerk, but it was sent too late, had material errors, and mother said she never received it.  (*Cathina W.*, *supra*, 68 Cal.App.4th at p. 723.)

The appellate court concluded that "[b]ecause good cause exists for [the appellant's] failure to file a timely writ petition from the setting order … we construe the purported appeal from the setting order as a petition for writ of mandate." (*Id.* at p. 260.) Whatever the merits of *Jennifer T.*, it is distinguishable on its own terms. *Jennifer T.* distinguished itself from *Cathina W.* as follows: "The instant matter is in a somewhat different posture [than *Cathina W.*]. Rather than an appeal from a termination order, we are presented with a purported appeal from the setting order." (*Jennifer T.*, *supra*, at p. 260.) Consequently, the court concluded it could construe the appeal from the setting order to be a writ petition challenging the setting order. But here, Travis has appealed a termination order, not the setting order.

## II. The Dependency Court did not Err in Denying Leann's Request to Order Yet Another Assessment for Placement[*]

Travis contends the court erred in failing to order CWS to reassess Leann for placement of the children. We disagree.

First, we observe that Leann's prior requests for placement were properly rejected. Leann failed to return a criminal exception packet to CWS. And Ruth – the owner of the home where Leann resided at the time – did not consent to placement of the children. We find no error in the fact that the children were not placed with Leann earlier in the proceedings.

At the section 366.26 hearing, counsel requested the court order CWS to reassess Leann for placement. This request was not properly presented. Travis concedes that it is "generally true" that placement of the children was not an issue properly before the dependency court at the section 366.26 hearing.[20] Because the subject is not inherently at

---

[*] See footnote, *ante*, page 1.

[20] However, he argues that the dependency court "in this case chose to address the issue, and permit the father to argue and present evidence that the Agency failed to conduct a proper investigation and assessment of [Leann] for purposes of placement of the children." It is true the court did not prevent counsel from arguing for a reassessment

24.

issue in the section 366.26 hearing itself,[21] it was incumbent on Leann and/or Travis[22] to raise the issue by some appropriate means, such as a section 388 petition.

## DISPOSITION

The order terminating parental rights is affirmed.

_____
POOCHIGIAN, J.

WE CONCUR:

_____
LEVY, Acting P.J.

_____
MEEHAN, J.

---

of Leann.  But that is not equivalent to the court excusing the untimeliness of the request or the failure to file a section 388 petition to raise the issue.  When the court ruled, it stated, "Now, at this stage, we have already reached the point of the [§ 366.26 hearing.]  The question is, is adoption appropriate, and are there any exceptions to that adoption under [§ 366.26]?  I've reviewed 366.26 yet again today.  I do not find any exceptions to finding that adoption is the appropriate permanent plan."  Nothing else in the court's discussion indicates that it was excusing any impropriety in how the request was made.

[21] Cases like *In re Isabella G.* (2016) 246 Cal.App.4th 708 are inapposite because they involve a request for placement prior to the *dispositional* hearing – which *does* inherently implicate placement.  (See § 361.2, subd. (e).)  Consequently, a section 388 petition is not required in those circumstances.  (*Isabella G.*, *supra*, 246 Cal.App.4th at p. 712.)

[22] It is not entirely clear that Travis has standing to raise this issue.  (See *In re Jayden M.* (2014) 228 Cal.App.4th 1452, 1459–1460.)  However, CWS has chosen not to "contest whether appellant has standing to raise this issue."