Filed 8/27/21  In re Daniel V. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re DANIEL V. et al., Persons Coming Under the Juvenile Court Law. | B309521 (Los Angeles County Super. Ct. No. 20CCJP04500) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. MONICA V., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Jana M. Seng, Judge.  Reversed and remanded with instructions.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

———————————

The Los Angeles County Department of Children and Family Services (DCFS) asserted dependency jurisdiction over 14-year-old Daniel V. and 12-year-old A.A., alleging, inter alia, that their mother (mother) failed to provide adequate care and supervision for Daniel (who had mental and emotional problems) and protect A.A. adequately from Daniel's aggressive behavior. At a subsequent adjudication hearing, the juvenile court sustained these jurisdictional allegations, removed Daniel and A.A. from mother's custody, placed Daniel in foster care, terminated jurisdiction over A.A., awarded A.A.'s presumed father (Jose A.) sole physical custody of A.A., and ordered monitored visitation with A.A. for mother. In its exit order, the juvenile court also ruled mother may seek unmonitored visitation from the family law court only upon completion of parenting classes and counseling.[1] Mother appeals the court's orders

---

[1] "When terminating its jurisdiction over a child who has been declared a dependent child of the court, [Welfare and Institutions Code] section 362.4 authorizes the juvenile court to issue a custody and visitation order (commonly referred to as an 'exit order') that will become part of the relevant family law file and remain in effect in the family law action 'until modified or terminated by a subsequent order.'" (*In re T.S.* (2020) 52 Cal.App.5th 503, 513.)

removing A.A. from her custody, awarding Jose sole physical custody of A.A., and allowing mother to have only monitored visits with the child.

We reverse the order removing A.A. from mother's custody because under our applicable level of review, the record does not contain substantial evidence demonstrating there was a high probability that mother posed a substantial risk of harm to A.A. justifying the juvenile court's removal order. We also reverse the exit orders awarding sole physical custody of A.A. to Jose A. and restricting mother to monitored visits with the child because the juvenile court could not make those rulings without first issuing a valid order removing A.A. from mother's physical custody. The matter is remanded for further proceedings consistent with this opinion.

**FACTUAL AND PROCEDURAL BACKGROUND**

We summarize only those facts relevant to this appeal.

1.  ***The dependency petition***

On August 27, 2020, DCFS filed a juvenile dependency petition, alleging jurisdiction over 14-year-old Daniel V. and 12-year-old A.A. under Welfare and Institutions Code section 300, subdivisions (a), (b)(1), (c), and (j).[2] The petition

---

[2] Undesignated statutory citations are to the Welfare and Institutions Code. Section 300, subdivision (a) provides that dependency jurisdiction is appropriate if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." (§ 300, subd. (a).) Subdivision (b)(1) authorizes jurisdiction if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm

3

alleged nine counts:  count a-1, count b-1, count b-2, count b-3, count b-4, count c-1, count j-1, count j-2, and count j-3.

Counts a-1, b-2, and j-2 alleged as follows:  "On a prior occasion . . . Daniel V[.'s] and [A.A.'s] mother . . . physically abused the child Daniel by throwing a metal container filled with kitchen utensils at the child, resulting in one of the utensils striking the child causing a bleeding scratch mark to the child's arm.  The mother struck the child with a belt resulting in a mark to the child's arm.  The mother pushed the child.  The mother struck the child's face resulting in a bruise to the child's lip.  On a prior occasion, the mother threatened the child with a hammer.  The mother struck the child's back with a belt and threw a book at the child.  On a prior occasion, the mother struck the child with a belt in the presence of the child[, A.A.]  The mother shoved

_____

or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . .  The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness."  (§ 300, subd. (b)(1).)  Additionally, subdivision (c) allows a juvenile court to exercise dependency jurisdiction over "[a] child [who] is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care."  (See § 300, subd. (c).)  Additionally, under subdivision (j), jurisdiction is proper if "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."  (§ 300, subd. (j).)

4

the child. Such physical abuse was excessive and caused the child unreasonable pain and suffering. Such physical abuse of the child Daniel by the mother endangers the child's physical health and safety, creates a detrimental home environment and places the child and the child's sibling[, A.A.], at risk of serious physical harm, damage, danger and physical abuse."

Counts b-1 and j-1 averred: "Daniel V[.'s] and [A.A.'s] mother . . . has a limited ability to provide the child Daniel with appropriate parental care and supervision due to the child's special and unique mental, emotional and behavioral problems including a diagnosis of Major Depressive Disorder. The child engages in self-harming behavior and has visual and audio hallucinations, suicidal ideation, and dangerous, aggressive, assaultive, and runaway behavior. On 08/12/2020, and on additional occasions, the child was hospitalized for the evaluation and treatment of the child's mental and emotional problems. The mother's limited ability to provide the child with appropriate parental care and supervision[ ] endangers the child's physical health and safety, and places the child and the child's sibling[, A.A.], at risk of serious physical harm, damage and danger."

Count b-3 alleged: "On prior occasions, . . . Daniel V[.'s] and [A.A.'s] mother . . . placed the children in detrimental and endangering situations, in that the mother left the children home alone, without appropriate adult supervision, despite the mother's knowledge of the child Daniel's aggressive and assaultive behavior towards the child[, A.A.] Such detrimental and endangering situations established for the children by the mother and the mother's failure to provide appropriate adult supervision for the children endangers the children's physical

5

health and safety, and places the children at risk of serious physical harm, damage and danger."

Counts b-4 and j-3 asserted: "On prior occasions, . . . Daniel V[.'s] and [A.A.'s] mother . . . placed the child Daniel in a detrimental and endangering situation, in that the mother repeatedly locked the child out of the child's home. Such detrimental and endangering situations established for the child Daniel by the mother endangers the child's physical health and safety and places the child and the child's sibling[, A.A.], at risk of serious physical harm, damage and danger."

Lastly, count c-1 claimed: "On prior occasions, the child Daniel V[.'s] mother . . . emotionally abused the child by physically abusing the child and speaking to the child in a demeaning and derogatory manner, including telling the child that the child has no reason to live. The mother repeatedly locks the child out of the child's home. The child displays thoughts of not wanting to live due to the emotional abuse of the child by the mother. Such ongoing emotional abuse of the child by the mother places the child at substantial risk of suffering serious emotional damage as evidenced by severe anxiety, depression, withdrawal, and aggressive behavior toward herself [*sic*] or others."

**2. *The non-detain report***

DCFS filed a non-detain report on August 27, 2020. As of August 26, 2020, Daniel V. was hospitalized at Del Amo Hospital and A.A. was residing with Jose A. On August 12, 2020, DCFS received a referral "alleging general neglect against . . . Daniel V[.] by mother," and on August 19, 2020, DCFS received another referral "alleging physical abuse and emotional abuse against . . . Daniel V[.] by mother"; with regard to both referrals, A.A. "was

6

considered to be at risk."[3]  The non-detain report recommended "the minors Daniel V[.] and [A.A.] remain in the care of their mother . . . and . . . [Jose A.], while under the supervision of the Court and with the support of" DCFS.

On August 13, 2020, mother told the agency that Jose A. is A.A.'s father, mother had full physical and legal custody of A.A., and Daniel V.'s father is Daniel V., Sr., an individual who lived in Mexico and for whom mother did not have any contact information.  Mother reported that she and Jose lived together for 14 years; the two "were not involved in physical altercations, but they had verbal altercations"; Jose "suddenly left the home without an explanation" in August 2019; and, after "a couple of months, [Jose A.] started sending her insulting text messages with derogatory words."  Mother claimed that she obtained a protective order for herself and A.A. that expired in spring 2020.[4]

Mother told DCFS that Daniel had been "hospitalized three times as a result of his mental health issues"—i.e., "depression, cutting, and suicidal ideations"—and that Daniel "was not given prescribed medication after his hospitalizations."  Mother reported that A.A. was "well mannered and did not require much discipline, but Daniel on the other hand was hard to discipline"; mother claimed "Daniel's behavior ha[d] gotten worse over the

---

[3]  Although the non-detain report claims that DCFS received the second referral on "08/19/2002," this appears to be a typographical error.

[4]  Attached to the jurisdiction/disposition report discussed in Factual and Procedural Background, part 5, *post*, is a restraining order against Jose A. that was dated November 12, 2019 and expired on May 12, 2020; the order granted mother sole legal and physical custody of A.A.

7

past year." Mother stated that "she did not know what to do or who to turn to and would like DCFS to assist her with services for Daniel."

Mother asserted that Daniel pushed her two times, injured A.A., and ran away from home three times; she claimed to have filed a missing person's report and called law enforcement several times "due to Daniel's ruthless behavior." Mother also claimed that "a few months ago[,] Daniel took [A.A.'s] phone, broke her bedroom doorframe, . . . would not let her use the bathroom or eat[,] . . . . [and] shov[ed A.A.] into her bedroom and onto the floor and hurt her hand." Mother reported that "she began to take Daniel to work with her so he would not be alone with [A.A.] after that incident." According to mother, she contacted law enforcement on one occasion "because Daniel refused to go to work with her."

Mother stated she violated the protective order in or around April 2020 by "inviting [Jose A.] over to her home" to "help . . . care for [A.A.], due to Daniel's out of control behavior"— i.e., she had Jose A. "move in with her as a means of protecting [A.A.] from Daniel." Mother said she and Jose later "had a disagreement and law enforcement was called." She stated that Jose left the home on the day of the disagreement, and, upon A.A.'s request, mother allowed A.A. to leave with Jose. Mother "reported that she ha[d] not seen or spoken with [A.A.] since 06/26/2020." Mother indicated she knew that A.A. could not return home "as long as Daniel continued to be defiant and aggressive," and she assured the interviewing social worker that A.A. would "temporarily remain[ ] with [Jose] until Daniel received the services he needed."

8

On August 13, 2020, Daniel V. reported that mother had thrown a metal container at him, and " 'the pointy part' " of the tongs in the container left a one-inch scratch on him that caused him to bleed. Daniel said that mother threw the metal container at him because, " '[S]he needed the bathroom and I locked myself in there. I wanted to eat and she told me to go to the car.' "

Daniel also stated, " '[Mother] was wearing a belt, she took it off, and she hit me on my left arm. It left a mark. She aimed like three-four times, but only hit me once. Then she threw my shoes in the trash and called the police. She pushed me outside so I could leave to the car.' "

On August 17, 2020, Jose A. told DCFS that he was with mother for 14 years, and that "Daniel 'always had bad behavior, he was hitting kids. He always behaved badly against [A.A.]' " Conversely, Jose asserted that A.A. "does not like to fight . . . ." Jose asserted that although he and mother had separated in August 2019, "she looked for him so he could help her with [A.A.,]" and Jose returned to the home in April 2020. He "stated that he did what he could to keep his daughter safe."

Jose A. stated that mother asked him to take A.A. with him, and that A.A. came with Jose on the day mother " 'kicked [Jose] out.' " Jose claimed that although he told A.A. to call mother every day, A.A. did not "want to talk to her mother because she could not do anything to correct Daniel." Jose further asserted that A.A. told him she did not want to visit mother.

On August 17, 2020, A.A. told DCFS that she "had no current contact with her mother[;] . . . did not recall the last time she spoke with, or saw, her[; and] . . . was 'not ready' to speak with mother because she 'didn't feel like it.' " A.A. "reported that

[Jose A.] encouraged her to speak with mother, but she did not want to."

A.A. claimed that neither Jose A. nor mother had subjected her to corporal punishment. A.A. "denied anyone called her names or made her feel badly about herself, but reported that Daniel used to call her 'fat and four eyes.' " She "reported feeling safe in the home of [Jose A.], but not in the home of mother. . . . due to Daniel's behavior." A.A. stated that "Daniel would randomly knee her on her groin, [and] has punched her stomach[ ] and pushed her." A.A. said that she felt much safer living with her father because she was " 'not worried about [her] brother coming into [her] room, taking [her] stuff, and hurting [her].' " A.A. claimed that "Daniel's behavior began to get out of control when the school shut down," and "that in school Daniel would talk a lot, get bad grades, and was distracted."[5]

A.A. stated that at an unspecified point in time when she was still living with mother, Daniel banged on her bedroom door, and shoved himself onto the door and cracked it.[6] A.A. said that Daniel took A.A.'s cellular telephone to prevent A.A. from reporting the incident to mother, and that he did not give the telephone back to A.A. until after he repaired the door with a glue gun.

When the interviewing social worker asked A.A. whether Daniel had "shov[ed] yogurt down her throat," A.A. stated that at an unspecified point in time, Daniel "grabbed a yogurt[,] . . .

---

[5] The non-detain report does not identify precisely "when the school shut down."

[6] A.A. claimed Daniel had broken her bedroom doorframe on prior occasions.

10

poured it down her throat, pushed her into her bedroom, . . . told her to stay there[,] . . . shoved her[,] and punched her on her stomach." A.A. claimed that Daniel had hit her before.

On August 19, 2020, a DCFS social worker interviewed Daniel at Del Amo Hospital.[7] Daniel claimed that mother threw a book at Daniel, and she " 'yelled [at] and punched [him]' " during an argument mother and Daniel had on another occasion. Daniel claimed that mother had locked him out of the house " 'more than a dozen times' " because he did not " 'do [his] part[,]' " and, although he " 'cook[ed] and clean[ed,] . . . she wanted [Daniel] to do more.' " Additionally, Daniel stated, " 'I have thoughts to kill myself a little, but no plans.' "

On August 19, 2020, mother reported to DCFS that law enforcement told her that "she had the right to lock [Daniel] out if he left on his own free will and [that she should] call them if he attempted to break in through a window as that was considered breaking and entering." Mother claimed that at an unspecified point in time, she came home because a "neighbor called her to inform her that there was an issue at home with Daniel." Mother asserted that upon her arrival, she "found Daniel choking [A.A.] through the porch window because [A.A.] had locked him out."

On August 21, 2020, Jose A. reported that mother "has not used physical discipline against [A.A.] or Daniel," and that, "as a form of discipline[, mother] would take [a] cell phone, or electronics away from the children and Daniel would go through

_____

[7] The Psychiatric Medical Response Team (PMRT) informed DCFS that mother had contacted the team on August 18, 2020 and "reported that Daniel was being aggressive." The PMRT informed DCFS that Daniel was hospitalized later that day.

11

the window to attempt to get them back."  Jose stated he "never heard [mother] talk down to the children or degrade them."

The agency once again interviewed A.A. on August 21, 2020.  A.A. "stated she was scared of being home with Daniel [V.]"  She also said she was " 'still not ready' to speak to mother . . . ."  A.A. said she felt safe at home with Jose A.

On August 24, 2020, Crystal Rodriguez told DCFS that she is a therapist who began providing mental health services to Daniel V. in August 2019 because Daniel reported that he wanted to cut his wrist and mother had him hospitalized.  She also indicated that she began her therapy sessions with A.A. in January 2019, and that the sessions ended in March 2020.

Ms. Rodriguez stated that " 'Daniel witnessed a lot of verbal fights between [mother] and [Jose A.,]' " and that " '[s]lowly Daniel started doing things to cause attention.' " Ms. Rodriguez opined that mother is " 'very protective over [A.A.] and it was hard for mother to praise or give Daniel attention other than bad attention.' "

Ms. Rodriguez stated Daniel V. had been diagnosed with Major Depressive Disorder and was not on medication.  She stated that Daniel never disclosed any physical abuse during their sessions, and that mother " 'would always say that Daniel would try to hit her.' "  Ms. Rodriguez stated A.A. did not disclose being subject to any physical discipline, and she did not observe any marks or bruises on the minors.  Although the non-detain report is not entirely clear on this point, it seems that Ms. Rodriguez reported to the agency that her therapy sessions with Daniel ended in July 2020.

12

### 3. *The September 1, 2020 last minute information report*

On August 31, 2020, Daniel V. was discharged from Del Amo Hospital and returned to mother's home. Later that day, Daniel told a DCFS social worker that he did not want to stay in mother's home because he " 'want[ed] to take a break from [his mother's] yelling and screaming.' " When he was asked what he would do if the juvenile court ordered him to stay home, Daniel responded, " 'I would try my best to stay home, but I don't know what I'd do if she hits me, she yells at me, screams at me, or takes her anger out on me.' " Daniel also stated, " 'I don't belong here. [Mother] usually tells me she doesn't want me here and wants to get rid of me.' "

Also on that date, Daniel's adult sister, L.A., told the agency "she felt [mother] needed therapy and parenting classes in order for her to learn how to deal with [L.A.'s] siblings." L.A. "stated that [mother], [A.A.], and Daniel needed to work on their communication 'because they all have very little patience, which leads to arguments.' " L.A. reported that mother "tends to yell and she needed to work on how she expressed herself to Daniel." L.A. stated that mother did not physically discipline her when she was a minor, and that she had not witnessed mother physically discipline her siblings.

In the last minute information report, DCFS stated it "continue[d] to recommend that . . . Daniel V[.] remain[ ] [in mother's home] as there [was] no current safety threat present, and a non-detention would provide the family with the opportunity to participate in therapeutic programs."

13

4. ***The September 1, 2020 detention hearing***[8]

At the September 1, 2020 detention hearing, the juvenile court declared that Jose A. is A.A.'s presumed father, but deferred making a paternity finding with respect to Daniel V. because Daniel V., Sr. had not made an appearance.[9]  The court detained Daniel and A.A. from mother, placed Daniel in shelter care pending the next hearing, and released A.A. to Jose A.'s custody.  The court authorized mother to have monitored visits with both children and ordered DCFS to provide "all appropriate referrals to the parents."

5. ***The jurisdiction/disposition report filed on October 8, 2020***

As of October 7, 2020 (i.e., the date on which the jurisdiction/disposition report was drafted), Daniel V. was in foster care and A.A. was living with Jose A.

---

[8]  The appellate record contains only one minute order from the September 1, 2020 detention hearing—i.e., the order concerning Daniel V.  We, sua sponte, take judicial notice of the minute order for A.A.  (See Evid. Code, §§ 452, subd. (d), 459.)

[9]  Whereas the reporter's transcript indicates the juvenile court declared Jose A. to be A.A.'s *presumed* father, the minute order shows the court found Jose to be only A.A.'s *alleged* father.  We assume the reporter's transcript is accurate.  (See *In re Hannah D.* (2017) 9 Cal.App.5th 662, 680 & fn. 14.)  Furthermore, at the October 29, 2020 adjudication hearing, the juvenile court once again declared that Jose is A.A.'s presumed father.

On August 4, 2020, mother filed a petition in family law court for a change in child support and visitation vis-à-vis A.A.[10] In the declaration accompanying the petition, mother asserted that on June 24, 2020, she made an arrangement with Jose A. to care for A.A. because mother was unable to address Daniel V.'s behavioral problems.  She also stated the arrangement was a safety measure to protect A.A. because Daniel hit her.  Mother further complained in her declaration that Jose had since prevented her from having contact with A.A.

DCFS interviewed A.A. on October 4, 2020.  A.A. stated that at the beginning of the coronavirus pandemic, mother and Jose A. left A.A. and Daniel in quarantine at home because the adults had to go to work.  A.A. claimed that she and Daniel were left alone for the entire week, except Saturdays and Sundays because those were mother's days off.  A.A. said that mother " 'was watching' " Daniel and A.A. with surveillance cameras in the home.

A.A. claimed that during that timeframe, Daniel V. hit her every day " 'in the side or stomach.' "  A.A. also asserted Daniel " 'broke [her] door' " and " 'disconnected [mother's surveillance] cameras a lot of times.' "  A.A. stated that she reported Daniel's behavior to mother, and mother replied that mother " 'would talk to' " Daniel.

Although A.A. claimed that mother did not punish Daniel, A.A. suggested mother did not do so because " '[s]he had . . . already taken away his phone, TV, and a lot of other privileges[; h]e only had his school computer.' "  A.A. stated that Daniel and

_____

**10** A hearing on this petition was scheduled for November 17, 2020.  The record does not reveal whether the family law court took any action on this petition.

15

mother fought "a lot and [got] into arguments," and would " 'push and shove each other.' " A.A. said she did not want to return to mother's home " '[b]ecause usually when [A.A. was] there and [Daniel was] there it [did]n't feel safe.' " (Boldface omitted.)

A.A. reported that mother locked Daniel V. out of the home approximately "once a week." (Boldface omitted.) A.A. stated mother would "force [Daniel] to go with her [to work] and lock him out [of] the house if he didn't want to go because [A.A.] was in there." (Boldface & underscoring omitted.)

On September 28, 2020, DCFS interviewed mother. Mother asserted that although Daniel had "always behaved badly," he "started being more aggressive" toward A.A. in March 2020. (Boldface omitted.) Mother indicated that in March 2020, she returned home from work and saw A.A. near the door "crying [and] saying [Daniel] had hit her." Mother claimed that A.A. told her Daniel "broke the door[,] . . . slapped her[,] . . . threw her on the floor[,] . . . took her phone[, and d]idn't let her use the restroom or eat."

The agency interviewed Jose A. on October 4, 2020. Jose said, " 'Daniel has always hit [A.A.] He's always been like that. All his life.' " (Boldface omitted.) Jose reported that A.A. " 'was scared [Daniel] would hit her again and retaliate for telling' " mother and Jose that Daniel had hurt her.

L.A. was interviewed on October 6, 2020. When the interviewing social worker asked L.A. about count c-1, she replied, " 'That's truth [*sic*], to an extent. . . . My mom loses her patience. There's a communication problem from both of them. . . . My mom can be aggressive and very blunt. She doesn't say it to be mean. She's just very direct. There's been times where I have to remind her we are her kids and she can't call us

16

these names.  She doesn't notice that she is emotionally abusive, but she does do it.' "  (Boldface & underscoring omitted.)

DCFS recommended that the juvenile court remove Daniel V. and A.A. from mother's custody, provide monitored visitation to mother, and terminate jurisdiction over A.A. with a family law order granting Jose A. sole physical custody over A.A.

## 6.     *The October 29, 2020 adjudication hearing*

At the adjudication hearing, the juvenile court admitted into evidence (inter alia) the non-detain report, the September 1, 2020 last minute information report, the jurisdiction/disposition report, and each report's respective attachments.[11]  The court dismissed counts a-1, b-3, b-4, c-1, j-2, and j-3, and sustained counts b-1 and j-1, and an amended version of count b-2.

The amended version of count b-2 that was sustained by the court read as follows:  "On a prior occasion, . . . Daniel V[.'s] and [A.A.'s] mother . . . inappropriately discipline[d] the child Daniel.  The mother struck the child with a belt resulting in a mark to the child's arm.  The mother pushed the child.  The mother struck the child's face resulting in a bruise to the child's lip.  The mother shoved the child.  Such inappropriate discipline was excessive and caused the child unreasonable pain and suffering.  Inappropriate discipline of the child Daniel by the mother endangers the child's physical health and safety, creates a detrimental home environment and places the child at risk of serious physical harm, damage, danger and physical abuse."

---

[11] The exhibit list mistakenly identified the non-detain report as a detention report.

17

The juvenile court declared Daniel V. and A.A. dependents of the court, removed Daniel and A.A. from mother's custody, and ordered DCFS to provide family reunification services regarding Daniel's case. The court terminated jurisdiction over A.A. and, in its "exit order" regarding A.A., (1) awarded Jose A. sole physical custody; (2) gave Jose A. and mother joint legal custody; (3) authorized mother to have monitored visits; and (4) stated "upon proof of parenting classes and individual counseling, mother may seek a court order for unmonitored visits."

Mother timely appealed the juvenile court's October 29, 2020 rulings.

## DISCUSSION

### A. The Record Does Not Support the Juvenile Court's Removal of A.A. from Mother's Physical Custody

In the non-detain report, which was filed on the same date as the dependency petition, DCFS stated that A.A. "reside[d] with father, Jose A[.,]" at an address that differed from that of mother's home. Mother asserts that A.A. "began residing with Jose in late June 2020." Because there is no dispute that pursuant to a family court order, mother had physical custody of A.A. but that A.A. did not reside with mother at the time the petition was filed, section 361, subdivision (d) provides the framework for our review.

Under section 361, subdivision (d), "[a] dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child did not reside at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence that there would be a substantial danger to the physical health, safety, protection, or physical or emotional

18

well-being of the child for the parent . . . to live with the child or otherwise exercise the parent's . . . right to physical custody, and there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from the child's parent's . . . physical custody." (§ 361, subd. (d).) Furthermore, a parent's right to physical custody "includ[es] the right to determine [the] placement" of the child, meaning that mother exercised her right to physical custody when she chose to allow A.A. to remain with Jose A. prior to the initiation of the dependency proceedings. (See *In re Anthony Q.* (2016) 5 Cal.App.5th 336, 354 (*Anthony Q.*).)

We review the juvenile court's factual findings for substantial evidence. (*In re Daniela G.* (2018) 23 Cal.App.5th 1083, 1090.) Where, as here, the burden of proof below was clear and convincing evidence, a higher standard governs our review as well. " '[A]ppellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands. . . . [W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence.' [Citation.]"

19

(*In re V.L.* (2020) 54 Cal.App.5th 147, 155 (*V.L.*), quoting *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996 (*O.B.*).)

"A finding of parental abuse cannot alone provide the clear and convincing evidence necessary to justify removing a child. [Citations.] Rather, the juvenile court must determine whether a child will be in substantial danger if permitted to remain in the parent's physical custody, considering not only the parent's past conduct, but also current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re I.R.* (2021) 61 Cal.App.5th 510, 520.)

To support the juvenile court's order removing A.A. from mother's physical custody, DCFS argues primarily that mother failed adequately to protect A.A. from Daniel V.'s aggressive behavior when both children were still residing in mother's home, and that mother's physical altercations with Daniel placed A.A. at a substantial risk of physical harm.

The record demonstrates that before A.A. left mother's home to reside with Jose A., mother took several measures in an attempt to safeguard A.A. from Daniel, including taking Daniel to therapy sessions, compelling Daniel to come to work with mother, and locking Daniel out of the home when he refused to go to work with mother. Indeed, the juvenile court acknowledged at the adjudication hearing that mother took "reasonable steps" to attempt to protect A.A., including "taking the child Daniel with her to work."

Regardless of whether mother's initial efforts to protect A.A. were adequate, she ultimately undertook an undisputable effective safety measure—she agreed to allow A.A. to live temporarily with Jose A. to prevent Daniel from harming A.A. Specifically, in the two months preceding the initiation of the

20

dependency proceedings, mother permitted A.A. to live with Jose even though she had physical custody over her pursuant to a family law court order.  A.A. reported she felt " 'much safer' " after she moved out of mother's home " 'because [she was] not worried about [Daniel] coming into [her] room, taking [her] stuff, and hurting [her].' "  Furthermore, mother "assure[d DCFS that A.A. would] remain[ ] with [Jose A.] until Daniel received the services he needed," and mother indicated she knew A.A. could not return home "as long as Daniel continued [to] be defiant and aggressive."

Under these circumstances, no reasonable factfinder could have "found it highly probable" there was a substantial danger that mother would allow Daniel to have access to A.A., or that Daniel and mother would have had a physical altercation in A.A.'s presence, if mother retained physical custody over A.A. (*V.L.*, *supra*, 54 Cal.App.5th at p. 155, quoting *O.B.*, *supra*, 9 Cal.5th at p. 996.)

DCFS suggests that mother herself also posed a substantial danger to A.A.'s well-being.  To support this assertion, DCFS cites an excerpt from the jurisdiction/disposition report that summarizes a May 13, 2019 referral alleging physical abuse, which the investigating social worker recommended to close as "inconclusive" in part because "there [was] no evidence of abuse or neglect at th[at] time."[12]  The report's summary of A.A.'s prior

---

[12] DCFS also cites an excerpt from the jurisdiction/disposition report that simply itemizes the documents the agency relied upon in preparing the report.  DCFS does not explain the relevance of this excerpt to its argument that mother presented a substantial danger to A.A., nor is it apparent that the list has any connection to that argument.

21

child welfare history does not show that the agency took any further action on this referral. This inconclusive referral does not support the removal order. (See Pen. Code, § 11165.12, subd. (c) [" 'Inconclusive report' means a report that is determined by the investigator who conducted the investigation not to be unfounded, but the findings are inconclusive and there is insufficient evidence to determine whether child abuse or neglect . . . has occurred."].) We also note that although A.A. told DCFS in August 2020 that she felt that "she was 'not ready' to speak with mother because she 'didn't feel like it[,]' " A.A.'s apparent animus towards mother is not determinative of whether the juvenile court erred in issuing its removal order.[13] (See *In re Abram L.* (2013) 219 Cal.App.4th 452, 464 ["Although they were entitled to have their wishes considered, the [children] were not entitled to decide where they would be placed [at the dispositional hearing]."].)

DCFS also argues that L.A. "disclosed mother would engage in name calling and could be 'aggressive and very blunt' and was 'emotionally abusive.' " The agency divorces this quotation from its context. According to the jurisdiction/disposition report, L.A. made this statement when she was asked about count c-1, which alleged that mother subjected *Daniel V.* to emotional abuse. L.A. did not claim that mother subjected A.A. to emotional abuse. In fact, A.A. indicated that Daniel V. was the only family member who had called her

---

[13] Additionally, the jurisdiction/disposition report indicated that although A.A.'s visits with mother following the September 1, 2020 detention hearing were "difficult[,] . . . progress [was] being made as the mother and child [we]re mending their bond."

names or made her feel bad about herself, and her former therapist opined that mother was "very protective" of A.A. To reiterate, the record reveals no reasonable factfinder could have found a high probability that mother posed a substantial danger to A.A.

For these reasons, we reverse the juvenile court's order removing A.A. from mother's physical custody pursuant to section 361, subdivision (d).

## B. Because We Reverse the Order Removing A.A. from Mother's Physical Custody, We Also Reverse the Juvenile Court's Exit Orders Awarding Jose A. Sole Physical Custody of A.A. and Limiting Mother to Monitored Visitation

At our request, the parties submitted letter briefs addressing whether, under section 361.2, subdivisions (a) and (b), our reversal of the order removing A.A. from mother's custody would necessitate the reversal of the exit orders awarding Jose A. sole physical custody and allowing mother to have only monitored visits with A.A.[14] In its supplemental brief, DCFS does not

[14] Section 361.2, subdivision (a) provides in pertinent part: "If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child." (§ 361.2, subd. (a).) In turn, subdivision (b)(1) provides: "If the court places the child with that parent, the court may do any of the following: [¶] (1) Order that the parent become legal and physical custodian of the child. The court may also provide reasonable visitation by the noncustodial parent. The court shall then terminate its jurisdiction over the child. The custody order

address whether any provision of section 361.2 authorized the juvenile court to issue these exit orders even if we were to reverse the order removing A.A. from mother's physical custody.[15]

Rather, DCFS suggests that section 362.4, subdivisions (a) and (b) allow these other rulings to remain intact even if the

shall continue unless modified by a subsequent order of the superior court." (*Id.*, subd. (b)(1).)

[15] In her supplemental brief, mother claims that section 361.2, subdivision (a) is inapplicable because "DCFS'[s] investigation started in mid-August 2020[,] . . . [A.A.'s] petition was filed on August 25, 2020[,] . . . [t]his is when the events or conditions arose that brought [A.A.] within section 300[,] . . . [and] during this period[, A.A.] resided with Jose." Mother cites a passage from *Anthony Q.* to support this proposition. (Citing *Anthony Q.*, *supra*, 5 Cal.App.5th at p. 353.)

Mother is mistaken. *Anthony Q.* construed the statutory phrase " 'with whom the child resides *at the time the petition was initiated*' " for the purposes of a removal order issued under section 361, subdivision (c), and concluded that text refers to "the time the section 300 petition was filed . . . ." (See *Anthony Q.*, *supra*, 5 Cal.App.5th at p. 339, italics added.) In the portion of the opinion cited by mother, the Court of Appeal distinguished that statutory language from "the start of the county's investigation or 'the time that the events or conditions arose that brought the [minor] within the provisions of Section 300,' . . . [under] section 361.2, subdivision (a) . . . ." (See *Anthony Q.*, at p. 353.) *Anthony Q.* did not hold that section 361.2, subdivision (a)'s use of the phrase "the time that the events or conditions arose that brought the child within the provisions of Section 300" is synonymous with the date of filing of the petition or with the start of DCFS's investigation. (See *Anthony Q.*, at p. 353.)

24

removal order is reversed.  For the reasons discussed below, we reject that argument.

Section 362.4, subdivision (a) provides in pertinent part:  "If the juvenile court terminates its jurisdiction over a minor who has been adjudged a dependent child of the juvenile court prior to the minor's attainment of the age of 18 years, and . . . an order has been entered with regard to the custody of that minor, the juvenile court on its own motion, may issue . . . an order determining the custody of, or visitation with, the child." (§ 362.4, subd. (a).)  As relevant here, subdivision (b) provides "[a]ny order issued pursuant to this section shall continue until modified or terminated by a subsequent order of the superior court."  (*Id.*, subd. (b).)

As explained in our Discussion part A, *ante*, section 361, subdivision (d) serves as a limitation on the juvenile court's authority to abridge mother's right to physical custody of A.A. (See § 361, subd. (d) ["A dependent child *shall not be taken* from the physical custody of his or her parents . . . with whom the child did not reside at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent . . . to . . . exercise the parent's . . . right to physical custody," italics added].)  Nothing in section 362.4, subdivisions (a) or (b) allows a juvenile court to deprive a parent of his or her physical custody rights even if clear and convincing evidence did not support removal under section 361, subdivision (d).  (See § 362.4, subds. (a)–(b).)  Nor does DCFS make any attempt to explain how a juvenile court could award Jose A. sole physical custody of A.A. without "tak[ing A.A.] from the physical custody

25

of" mother for the purposes of section 361, subdivision (d).[16] (See § 361, subd. (d); see also *Pack v. Kings County Human Services Agency* (2001) 89 Cal.App.4th 821, 826, fn. 5 [" 'Although it is the appellant's task to show error, there is a corresponding obligation on the part of the respondent to aid the appellate court in sustaining the judgment. "[I]t is as much the duty of the respondent to assist the [appellate] court upon the appeal as it is to properly present a case in the first instance, in the court below." [Citations.]' [Citation.]"].)

DCFS intimates that *In re Nicholas H.* (2003) 112 Cal.App.4th 251, and *In re John W.* (1996) 41 Cal.App.4th 961, establish that section 362.4, subdivisions (a) and (b) permitted the juvenile court to grant Jose A. sole physical custody of A.A. so long as doing so was in " 'the best interests of the child.' " (Quoting *Nicholas H.*, at p. 268.) Neither decision held that section 362.4 supersedes or supplants section 361's limitations on the juvenile court's power to remove a dependent child from a parent's physical custody. (See *Nicholas H.*, at pp. 256–258, 265–268, 270 [the mother challenged exit orders issued at a review hearing two years after the juvenile court removed the child from her custody; the validity of the removal order was not at issue in that appeal]; *John W.*, at pp. 964–965, 968–969, 973–974 [the parents appealed an exit order that did not remove the child from either parent's physical custody because the juvenile court had awarded them joint custody].)

Furthermore, because the order removing A.A. from mother's physical custody was invalid and the juvenile court thus

---

[16] As we explained footnote 4, *ante*, mother had sole legal and physical custody of A.A. before the juvenile court issued its dispositional rulings.

26

lacked authority to award sole physical custody of A.A. to Jose, its order restricting mother to monitored visitation is also invalid. (See *Celia S. v. Hugo H.* (2016) 3 Cal.App.5th 655, 657, 663–665 [holding that a grant of sole or joint physical custody of a child cannot be characterized as merely an award of visitation].) Because we reverse the visitation order in its entirety, we need not address mother's contention that the court lacked the authority to condition her right to seek unmonitored visits on her completion of parenting classes and counseling.

In sum, we conclude that our reversal of the juvenile court's order removing A.A. from mother's custody pursuant to section 361, subdivision (d) necessitates the reversal of the exit orders awarding Jose A. sole physical custody of A.A. and allowing mother to have only monitored visitation with the child.

## DISPOSITION

We reverse the juvenile court's orders removing A.A. from mother's physical custody, granting Jose A. sole physical custody of A.A., and permitting mother to have only monitored visitation with the child. This matter is remanded to the juvenile court for further proceedings consistent with this opinion.

NOT TO BE PUBLISHED.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

CRANDALL, J.*

_____

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.