Filed 5/7/26  In re L.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| In re L.M., a Person Coming Under the Juvenile Court Law. | |
| | E087246 |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | (Super.Ct.No. DPRI2200099) |
| Plaintiff and Appellant, | OPINION |
| v. | |
| J.M. et al., | |
| Defendants and Respondents. | |

APPEAL from the Superior Court of Riverside County.  Walter H. Kubelun, Judge.  Affirmed.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant, J.M.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant, A.M.

1

Minh C. Tran, County Counsel, Jamila T. Purnell and Julie Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

At a Welfare and Institutions Code section 366.26 hearing,[1] the juvenile court terminated A.M.'s (mother) and J.M.'s (father, collectively parents) parental rights to L.M. (minor, born June 2019). On appeal, mother contends the court erred in declining to apply the beneficial parental relationship exception to termination of parental rights. Father joins mother's arguments.

Father filed a motion for leave to file a supplemental brief and substitute counsel. We denied father's request, but we agreed to address father's claims to the extent that he was contending that appellate counsel had been prejudicially ineffective in declining to raise them. Father maintains the court wrongfully terminated his reunification services. Father contends he was denied structural due process when he allegedly received no notice of the hearing on April 21, 2025, only one day's notice of the hearing on June 6, 2025, and was denied "every procedural right available to him" at the hearing on October 27, 2025. Father asserts the court's reduction in his visitation with minor also violated his due process rights. Additionally, father argues the maternal grandfather now recants an allegation he allegedly made that he had personally observed father assault mother in January 2023. Father argues the social worker's pattern of misconduct denied him a fair proceeding. Finally, father contends the beneficial relationship exception applied to him. We affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code.

# I. FACTUAL AND PROCEDURAL HISTORY[2]

On September 13, 2022, personnel from plaintiff and respondent the Riverside Department of Public Social Services (the department) received an immediate response referral alleging physical and emotional abuse. Mother had gone to work on September 8, 2022, where a coworker became worried after observing extensive bruising on mother's face; the coworker shared photographs she took of mother's face with the maternal aunt; the maternal aunt contacted the maternal grandmother; both called law enforcement. (*A.M. v. Superior Court* (Sep. 13, 2024, E084059) [nonpub. opn.] (*A.M.*).)

Both parents were arrested. Officers released minor, who was asleep, to the maternal grandmother. When minor awoke, she screamed that her foot hurt, and that she could not put weight on her leg. Minor disclosed that mother kicked her and that both parents hit her. A soft cast was applied to minor's leg, and it was advised that she follow up with a pediatrician. The social worker responded to the maternal grandmother's residence, where she observed minor with a soft cast on her leg; there was bruising and swelling to minor's shin, leg, and back. (*A.M.*, *supra*, E084059.)

The maternal grandmother reported that mother had previously been placed on a psychiatric hold. She reported that mother had a significant history of substance abuse but was unsure if mother was using again. The maternal grandmother reported that mother had mental health diagnoses including battered women's syndrome, depression, and anxiety. (*A.M.*, *supra*, E084059.)

[2] We ordered the record in case No. E084059 incorporated in the record in this case.

On September 15, 2022, the social worker took minor into protective custody and placed her with the maternal grandmother. Mother disclosed a history of drug use including cocaine and MDMA (ecstasy). She said she last used cocaine three years earlier and ecstasy a few months earlier. Mother maintained that she had engaged in self-harming behaviors including punching herself and cutting herself with a knife. (*A.M.*, *supra*, E084059.)

The maternal grandmother reported that mother had been living with her for the past 18 months after moving to California from Hawaii to flee "numerous incidents of domestic violence." Father would visit mother and minor; the maternal grandmother would not allow father to stay at her home because the family was afraid of him.

Parents had two previous dependency referrals the previous year alleging abuse of controlled substances, mental health issues, and domestic violence, which the department deemed, respectively, unfounded and inconclusive. During those referrals, mother reported that she had moved away from Hawaii, where father lived, to get away from him and focus on her mental health.

Father "confirmed he was living in Hawaii and working in Alaska as an offshore fisherman. The father noted he has two children in Hawaii that he voluntarily relinquished custody of because it was in their best interest." Father said he had been arrested in Washington State for domestic violence, but no charges had been filed. Father denied any incidents of domestic violence between he and mother.

The department filed a section 300 juvenile dependency petition alleging that parents had an extensive history of engaging in domestic violence in the presence of minor, the most recent of which resulted in injury to minor (a-1 & b-2); that mother neglected the health, safety, and well-being of minor (b-3); that mother suffered unresolved mental health issues (b-4); and that father had an unresolved history of mental health issues (b-5).[3]  The court detained minor on September 20, 2022.  (*A.M.*, *supra*, E084059.)

In the jurisdiction and disposition report filed October 17, 2022, the social worker recommended the court find the allegations true, remove minor from parents' custody, and order reunification services for parents.  The social worker proposed that parents have separate, supervised visitation twice weekly for one hour.  (*A.M.*, *supra*, E084059.)

The social worker reported that visitation with parents had been positive.  Minor was excited to see parents.  Parents engaged in age-appropriate conversation and games with her.  Minor had difficulty separating from mother during a visit. (*A.M.*, *supra*, E084059.)

A forensic medical exam of minor found no definitive physical abuse findings; however, the social worker noted that minor's exposure to domestic violence between parents was associated with psychological harm, which would constitute neglect.  (*A.M.*, *supra*, E084059.)

---

[3]  The department later filed a first amended petition, which removed the a-1 allegation.  (*A.M.*, *supra*, E084059.)

On October 28, 2022, the maternal grandmother filed for de facto parent status. In an addendum report filed November 3, 2022, the social worker reported that parents visited separately; when minor saw parents, she appeared happy. Parents engaged in appropriate games and conversation with minor. Minor was bonding with parents, and no safety concerns had been observed. (*A.M.*, *supra*, E084059.)

At the hearing on November 8, 2022, the court found the allegations in the amended petition true, removed minor from parents' custody, and approved the parents' case plans. The court granted the maternal grandmother's request for de facto parent status. (*A.M.*, *supra*, E084059.)

In the six-month status report filed April 11, 2023, the social worker recommended the court grant parents six months of additional services. Mother reported she had moved into an apartment with father and the maternal grandfather, which father confirmed. (*A.M.*, *supra*, E084059.)

The court ordered visitation by parents to take place separately; however, mother "would linger into the father's visitation time frequently. Because of this, a change was made . . . so that there was a 15-minute window in between the parents' visitation times." Otherwise, the "visits had been going well. The parents interact with the child positively and lovingly. They are very attentive towards the child and ensure her needs are met and play with her." (*A.M.*, *supra*, E084059.)

The maternal grandmother informed the social worker on January 8, 2023, that father had physically assaulted mother the prior night. She called the police. Father left

6

before police arrived. The maternal grandmother sent the social worker photos of mother's injuries. (*A.M.*, *supra*, E084059.)

The social worker had previously told parents their visits could start to take place out in the community; however, after the domestic violence incident, the social worker required that all visits be supervised by a social services assistant (SSA) in the department's offices. (*A.M.*, *supra*, E084059.)

At the hearing on June 5, 2023, the court granted parents six additional months of services and directed the department to include information regarding domestic violence incidents and mother's drug test results in future reports. (*A.M.*, *supra*, E084059.)

In the October 24, 2023, 12-month status review report, the social worker recommended the court terminate father's reunification services but provide mother six additional months of services. The social worker noted that mother continued to make adequate progress in her case plan services. However, father had not been cooperative, had not completed any case plan services, and had not initiated any service to which he had been referred.

Mother informed the social worker that parents had "ended their relationship around June or July 2023. She denied having any prior relationships characterized by intimate partner violence."

"Overall, the feedback received from SSA's who supervise the father's visits and my observations of the father's visits have been consistently positive. The father is present and completely engaged with the child during each visit. He is very loving and

positive towards the child, and tells her very positive things about herself. He ensures to bring snacks or food for her and toys or some other activity to engage in with her."[4]

In the November 21, 2023, addendum report, the social worker reported that mother indicated she had enrolled and was participating in prevention services and had completed the first three sessions and needed to complete one more. Father had not been cooperative with the department and had not initiated any of the services to which he had been referred. (*A.M.*, *supra*, E084059.)

At the hearing on November 28, 2023, minor's counsel and the department agreed that mother's visitations should "increase to . . . four or eight hours of unsupervised, and then eventually overnight, . . . And dad is not to be around mom." "[W]e can start the unsupervised visits for the mother and, hopefully, go into overnights, and then [family maintenance] with mother." (*A.M.*, *supra*, E084059.)

The court terminated father's reunification services.[5] The court granted mother additional reunification services but noted, "we need to either have the child be in a position to return to mother's care on family maintenance in the next four months or terminate services to mother." (*A.M.*, *supra*, E084059.)

The court ordered that once mother had a negative drug test and had "completed at least four sessions of counseling, I will allow for additional unsupervised visits in

---

[4] Although the social worker reported on the quantity of mother's visitation with minor, there was no qualitative assessment.

[5] Father did not appeal the order.

8

duration and frequency, transitioning the child to overnights and ultimately family maintenance." (*A.M.*, *supra*, E084059.)

The court noted, "Mother should not have any contact with dad in the presence of the minor, otherwise the Department is authorized to revert back to supervised or do what the Department feels is appropriate." (*A.M.*, *supra*, E084059.)

On February 2, 2024, the social worker informed mother they were going to discontinue unsupervised visitation for mother. The court ordered a temporary halt to unsupervised visitation.[6] (*A.M.*, *supra*, E084059.)

On February 14, 2024, the department filed an ex parte request to terminate mother's unsupervised visits. The maternal grandmother reported that on January 25, 2024, minor asked if she would get to see father at mother's apartment again. On the same day, minor had told the SSA that she would sometimes see father during visits at mother's home, and they would play together.

Mother denied that father had been present during any of the visits. She indicated that father and she "aren't even on speaking terms and I surrendered my ownership of the car . . . so that's not a connection anymore either." The maternal aunt reported that minor had informed her she had seen father recently, and that they had watched videos together with mother. (*A.M.*, *supra*, E084059.)

In the February 15, 2024, 18-month status review report, the social worker recommended the court terminate mother's reunification services and set the section

_____

[6] It is unclear from the report how many unsupervised visits mother had before the department halted them.

366.26 hearing. The social worker had conducted an unannounced visit on November 22, 2023, to mother's home after father's supervised visitation; while parked outside, she observed father drive his car into mother's garage. The social worker knocked on the door, but no one answered even though she heard shuffling feet inside. (*A.M.*, *supra*, E084059.)

After the social worker cancelled unsupervised visitation, mother denied that father lived with her: "She reported that both she and the father own the car that he drives, but they had arranged for her to keep the car and he is able to use the car when he was in town for his visits." "She stated that she does not allow the father to come into her apartment." (*A.M.*, *supra*, E084059.)

Mother and minor had a supervised visit on February 6, 2024: "The mother was appropriate and very attentive and loving towards [minor]." (*A.M.*, *supra*, E084059.) Father had supervised visits with minor on November 30, December 14, 28, 2023, January 25, and February 15, 2024.

During contiguous visitation for parents scheduled in different rooms at the department offices on February 15, 2025, minor "appeared happy to have both parents together. She told the mother, 'Mommy! You can come into this room with me and Daddy!' [Minor's] eye contact and body language suggested that she was hoping to have a visit with both parents, now that the father had arrived."

The social worker opined, "mother does not appear to be truthful with the Department about her relationship with the father, which poses a safety concern for the

child.  The father was uncooperative with the Department in terms of completing his case plan when he was offered 12 months of services.  Further, he failed to take any responsibility for the family's circumstances and placed all culpability on the mother.  The father's unaddressed anger issues and history of domestic violence, coupled with the mother's lack of insight as to the effects of her child witnessing intimate partner violence, places the child at high risk of future physical and emotional harm if she were to be returned to the mother at this point in time."  (*A.M.*, *supra*, E084059.)

At the 18-month hearing on April 9, 2024, minor testified she loved mother.  According to minor, she visited with parents in separate rooms at separate times, "Because they keep fighting."  Mother testified she was not in a relationship with father, and that father was not present during unsupervised visits.  The court continued the contested hearing.  (*A.M.*, *supra*, E084059.)

At the continued hearing, minor's counsel argued the court should follow the department's recommendations and terminate mother's services and set the section 366.26 hearing:  "I do want to recognize that this is clearly a mother who loves her child very much, and I believe [minor] loves her mother as well."  "I would not object to keeping the . . . same weekly visitation so that relationship can be maintained.  And Mother can perhaps seek services on her own and potentially file a JV-180."  (*A.M.*, *supra*, E084059.)

The court observed, "We have a situation where the minor was actually injured during the course of a domestic violence incident between Mother and Father.  The minor

11

was removed as a result of that. There was a subsequent incident even after that where Mother and Father were together." The court observed that mother contradicted herself in her testimony with respect to when the relationship with father ended. (*A.M.*, *supra*, E084059.)

The court found minor's reports of seeing father at mother's home during unsupervised visits supported by disclosures made to the maternal aunt and maternal grandmother. The court terminated mother's reunification services and set the section 366.26 hearing.[7] (*A.M.*, *supra*, E084059.)

Mother filed a petition for extraordinary writ, which we denied by opinion filed September 13, 2024. (*A.M.*, *supra*, E084059.) Father did not file a notice of intent to file a petition for extraordinary writ.

In the section 366.26 report filed October 1, 2024, the social worker requested an extension to allow the preliminary adoption assessment to be completed. The social worker recommended visitation be reduced to once monthly.

The maternal aunt had traveled to California to visit with minor between April 20, and 24, 2024. The maternal grandmother and minor traveled to Minnesota to visit with the maternal aunt between April 2, and 6; July 19, and 26; and September 5, and 9, 2024. Minor had expressed not wanting to leave the maternal aunt's home in Minnesota. She stated she loved being in the maternal aunt's home.

---

[7] As requested by the department, the court ordered authorization for an Interstate Compact on the Placement of Children (ICPC) for placement of minor with a maternal aunt in Minnesota. As requested by mother's counsel, the court ordered a bonding study for mother and minor.

The ICPC for the maternal aunt had been approved. The ICPC Unit "indicated that a referral for a Preliminary Adoption Assessment could be submitted once [minor] has been placed in Minnesota with her maternal aunt and uncle." The department requested the juvenile court's approval to place minor with the maternal aunt and uncle in Minnesota.

During the reporting period, mother had hourly supervised visits with minor twice weekly. Father had hourly supervised visits twice monthly. "[E]ach parent is consistently appropriate, loving, and attentive towards the child during their visits. The parents . . . consistently bring food, drinks, and toys or activities for the child and them to do during visits. The mother and father are both very positive towards the child and ensure to meet her needs during visits."

At the hearing on October 31, 2024, counsel for the maternal grandmother noted that the ICPC for the maternal aunt had already been approved, that the maternal grandmother was moving to Minnesota in late November, and that she would remain available for continued placement if necessary.

In an addendum report filed November 19, 2024, the social worker recommended the court place minor in an adoptive home with the maternal aunt in Minnesota.

In a report filed February 11, 2025, the social worker requested an additional 120 days to complete the preliminary adoption assessment. The social worker recommended mother's visitation be reduced to twice a month and father's to once monthly. On December 16, 2024, mother and minor participated in a one-hour bonding study. The

13

department had placed minor with the maternal aunt and uncle in Minnesota on December 17, 2024.

Father visited with minor on December 16, 2024. "The visit went well, and the father was appropriate during the visit. He was attentive and loving towards the child." The social worker subsequently texted father several times regarding times for virtual visits but did not receive a reply, which necessitated cancellations of the visits. Afterward, father replied by email, "'Why wouldn't you text me back? I've been texting you for the past month!'" The social worker responded by indicating she did not know about what messages father was writing; she gave father her phone number again to ensure he had the correct number and asked him to confirm his next visit. She did not receive a reply. His next visit was cancelled for failure to confirm. "[F]ather has not been consistent nor communicative with the Department for FaceTime calls with the child."

Mother's last in-person visit with minor occurred on December 16, 2024. "[M]other was appropriate during the visit, but became visibly emotional at times and would tell the child how much she loves her. When leaving . . . the visit to transport the child to daycare, the child was quiet and appeared pensive. She returned happily to daycare."

Once minor moved to Minnesota, FaceTime calls between mother and minor were scheduled twice weekly for an hour. Visits occurred on December 19, 23, and 26, 2024. Once minor began her new school schedule, visits occurred on December 30, 2024;

14

January 2, 6, 8, 13, 15, 20, 22, 27, 29; and February 3, 5, and 10, 2025. The visits "went well overall."

"At this time, the child is acclimating well and adjusting to her placement with maternal aunt and uncle. She appears to be happy and well taken care of. She is very loved and has all her needs met by the caregivers. The maternal aunt and uncle are undergoing the process to complete the preliminary adoption assessment."

Father and his counsel appeared at the February 18, 2025, hearing, at which counsel for the department indicated, "we do have a [366].3 for this matter. That's set on April 21st, 2025 and ask to confirm that date." The court noted, "We'll set this— essentially for what we'll call a pretrial for June 6, 2025. All parties are ordered to return without further notice on that date."

The court noted, "I'm going to dispense with further statutory notice to both Mother and Father, who are present at this point in time. I do have the future dates. I will confirm the [366].3 for April 21st, 2025. All parties are informed of that date as well, and those will be the orders of the Court." The court denied the department's request to reduce visitation.

In the section 366.3 postpermanency status review report filed April 7, 2025, the social worker reported that minor "has had a bond and close relationship with the maternal aunt since she was a baby, and the maternal grandmother has been able to maintain a close relationship and attachment with [minor], as she moved from California to Minnesota at the time of [minor's] placement change."

15

Minor "is very stable in her placement and has adjusted extremely well. [Minor] is happy and thriving and has a strong bond with her caregivers, whom she calls 'Mommy' and 'Daddy' and sometimes 'Auntie' and 'Uncle . . . .' The caregivers continue to express their desire and commitment to providing [minor] with stability and consistency, as well as provide her with . . . permanency in a loving and nurturing environment, as [minor] is unable to return to the care of the parents. The caregivers have ensured that [minor's] immediate medical, social, developmental, emotional, and physical needs are being met abundantly."

"Additionally, [minor] loves helping the maternal aunt with taking care of, playing with, and entertaining her twin cousins. She has expressed that they are like little sisters to her. Further, the maternal grandmother, [other] maternal aunt, . . . and her four-year-old son have relocated to Minnesota nearby [minor's] placement home. [Minor] has been able to maintain her lifelong connections with her maternal grandmother, maternal aunt, and cousin through this placement change."

The social worker contacted father several times to confirm a virtual visit for February 21, 2025, but never received a response.[8] The social worker later requested father confirm the next scheduled visit for March 7, 2025, which father did. Father had a two hour supervised visit that day. "The visit went well, and the father was appropriate. The child was happy to see and talk to the father. The father was upbeat and led the

---

[8] Although the report does not expressly so state, it appears the visit never occurred.

conversation with the child. The child mirrored the father's demeanor and appeared to be cheerful and playful."

Father later requested that he be allowed make-up visits for those he missed; the social worker informed him they could not be made up. She informed him his next visit was scheduled March 21, 2025. On March 7, 2025, the father had a two hour supervised virtual visit with minor via Zoom. "The visit went well, although the father experienced some issues with internet connection and ability to hear the child. However, the father was appropriate and again led the conversation with the child. The child appeared to be happy and was extremely sweet towards the father. The father was loving and attentive towards the child."

Mother had supervised FaceTime video visits with minor on February 12, 18, 19, 24, 26; March 3, 5, 10, 12, 17, 19, 24, 26, 31; and April 2, 2025. "As to the FaceTime visit that took place on [February 12, 2025], I noted that the child referred to the maternal aunt and uncle as 'Mommy' and 'Daddy.' The mother's demeanor changed from happy and light-hearted to serious and upset after the child told the mother that she sometimes calls her maternal aunt 'Mommy,' and uncle 'Daddy.' She told the mother, 'You'll always be my mom, and you will always be in my heart.' The mother became tearful, and her demeanor remained serious and upset, possibly angry, as she became much less talkative and cried quietly."

On April 15, 2025, the department notified father by mail of the section 366.3 hearing scheduled for April 21, 2025. At the hearing on April 21, 2025, counsel for

17

father, who was not present, appeared. The court set the contested section 366.3 hearing by stipulation of counsel for September 23, 2025, and reduced parents' visitation to twice supervised monthly.[9]

On May 27, 2025, father filed a section 388 petition requesting the court review the lack of notification for the hearing held on April 21, 2025, vacate or reconsider any order made at that hearing, and reinstate the frequency of visitation reduced at that hearing. The court set father's petition for an evidentiary hearing on July 9, 2025. The department notified father of the hearing by mail on May 28 and 29, 2025.

In an addendum report filed June 4, 2025, the social worker requested that parents' visits be reduced to once monthly. Mother had visited with minor on April 7, 9, 14, 16, 21, 23; May 7, 21; and June 4, 2025. Father had a two hour supervised virtual visit with minor on April 4, and May 16, 2025.[10] "Since March 2025, the father has attended six Zoom visits with the child. Most of the Zoom visits have been appropriate and positive." However, "the caregiver reported that the child has been experiencing behavioral difficulty after each Zoom call with the father, as she has more severe tantrums, more anger, nightmares, and bedwetting."

At the hearing on June 6, 2025, at which father's counsel appeared, the court set the contested section 366.26 hearing for July 9, 2025.

---

[9] Father did not appeal the order.

[10] It appears that father may have had additional visits, which the social worker failed to document.

In an addendum report filed June 27, 2025, the social worker recommended the court terminate parents' parental rights. On the same date, the department filed opposition to father's section 388 petition recommending the court deny the petition, find minor adoptable, and terminate parents' parental rights.

Mother visited with minor on June 16, 2025. Minor "became so emotional that she said while crying, 'I just want to be with my mommy.' This caused the mother to break down in tears and tell the child that she wanted to be with her, too." Father had a two-hour virtual visit with minor on June 13, 2025. "The Zoom call went well, and the father was appropriate with the child." Father had a two-hour virtual visit with minor on June 24, 2025. "The Zoom call went well and the father was appropriate with the child."

On July 2, 2025, father's counsel filed a section 388 petition requesting six more months of reunification services and increased visitation. Father's counsel alleged a change in circumstances in that father had completed parenting classes, domestic violence and anger management programs, and was enrolled in an additional anger management course. The court set the matter for an evidentiary hearing on August 6, 2025.[11]

At the hearing on July 9, 2025, at which father and father's counsel were present, the court set the evidentiary hearing on the section 388 petitions and the contested section 366.26 hearing for August 22, 2025. The court noted, "Father is here, ordered to return without further notice."

_____

[11] The court later referred to the latter petition as an "updated" or " supplemental JV 180 for father."

On August 8, 2025, father filed a third section 388 petition requesting "Re-evaluation of the case for suspected Fraud and Unethical Bias and Discrimination" and reexamination and vacation of "any prior findings of the court that were based on fabricated statements and or biased reports submitted by" the social worker.[12] The court ordered an evidentiary hearing on the petition on August 22, 2025. The court notified father of the hearing by mail.

In the August 19, 2025, response, the social worker recommended the section 388 petitions be denied. The social worker noted that a previous report dated May 9, 2023, reflected that father made allegations that the maternal aunt spanks minor.[13]

Also on August 19, 2025, mother filed a section 388 petition requesting increased visitation and a legal guardianship by the maternal aunt. Mother attached the results of a bonding study conducted on December 16, 2024, in which the therapist opined, "This writer also feels that if the case continues to go forward the court could consider legal guardianship rather than adoption due to the strong bond between the child and mother."

---

[12] The precise allegations of fraud, bias, discrimination, and fabrication by the social worker are either not presented in the petition or are not legible because they appear to have been typed into a computer document which had limited space. It is notable that our prior opinion from mother's petition for extraordinary writ, to which father was not a party, addressed issues of bias by the social worker. (*A.M.*, *supra*, E084059.) Father additionally alleged child abuse by the maternal aunt against minor, which minor allegedly relayed to him on July 1, 2023, and which he alleged was witnessed by the social worker.

[13] There does not appear to be a report dated May 9, 2023, in the record. However, in the service logs, there are two mentions in entries dated December 6, 2022, and February 14, 2023, of father alleging the maternal aunt spanked minor.

Mother filed another section 388 petition on August 21, 2025, requesting the same relief, but including five letters of recommendation, six letters from therapists, the results of several negative drug tests, and certificates of completion of several programs. On August 22, 2025, mother separately filed an additional negative drug test. The court ordered an evidentiary hearing on the petition on September 4, 2025.

At the hearing on August 22, 2025, the court continued the matters to September 4, 2025. On August 26, 2025, the court rejected father's motion to relieve father's counsel.

In an addendum report filed August 29, 2025, the social worker recommended the court deny the section 388 petitions. The social worker noted, "Most of the reference letters, certificates of completion, and/or progress letters attached to [mother's] JV-180 were either previously filed with the Court and/or were provided before termination of the mother's reunification services." "The Department's suspicion remains strong that the parents are in a romantic relationship, demonstrating no benefit from previously completed services/courses, and that the parents continue to try to deceive the Court by denying their relationship." "Currently, the child needs and deserves permanency. She has been in a safe, stable relative placement with her maternal aunt and uncle for over nine months. The relative caregivers demonstrated that their priority is the child's safety and well-being."

At the hearing on September 4, 2025, at which father was not present but was represented by counsel, the court set the evidentiary hearings on the section 388 petitions

21

and the section 366.26 hearing for October 27, 2025, at 8:30 a.m.; "I will reserve 1:30 p.m. if necessary for additional information and testimony."

In a status review report, the social worker reported that mother had additional, one-hour, supervised Facetime/Zoom visits with minor on June 24; July 1 and 15; and August 7, and 21, 2025. Father had additional one-hour, supervised Facetime/Zoom visits with minor on July 25, and August 8, 2025. "[V]ideo calls for the mother and father have been fine with no major concerns. The parents are very attentive to the child." The department notified father of the hearing scheduled for 1:30 p.m. on October 27, 2025, by mail on September 10, 2025.

At the morning hearing on October 27, 2025, at which father was not present, father's counsel noted, "Father was not present at the September 4th hearing when we scheduled this hearing. The notice for today's hearing was set for 1:30 p.m. Father requested to testify. I also submitted offers of proof so that he could testify today; however, he is not here."

The court responded that it "had previously terminated or dispensed with further statutory notice; therefore, there is proper notice. Father was—or made himself available on occasion, was informed of these proceedings, and I think it's a courtesy notice as of today. The Court did order everyone, all parties and counsel, here at 8:30 a.m. Everyone is here except the father, so that will be noted for the record." "[W]e dispensed with further statutory notice for Father."

Father's counsel argued that "because of Father's progress, because of the strong bond between him and his child, that our 388 motion for Father to resume family reunification services should be granted." As the court began to rule on father's petitions, father appeared in court. The court recessed.

When the court went back on the record, it noted, "Father entered the courtroom. We took a recess so Counsel could confer with his client. We are now ready to proceed."

The court allowed argument on father's section 388 petitions again. Father's counsel noted, "Father has given me additional documents as referenced by county counsel. Father has completed 33 sessions of his anger management that he has taken on his own. He had already completed the anger management classes, as set previously, as well as parenting, as well as domestic violence, and he, on his own, enrolled in this anger management class." Both the department and minor's counsel argued father's petitions should be denied.

The court denied mother's section 388 petition finding it was "in the best interest of the child to remain in the current placement and be provided safety and permanency." As to the section 388 petitions personally filed by father, the court stated, "that is ultimately going to be denied on its face or as having no change in circumstances . . . ."

The court denied father's remaining petition finding that "we're well past two years of services or the availability to engage in services." With respect to father's abuse allegations, the court noted the department took father's concerns seriously and investigated the issue. Ultimately, "minor was contacted, observations were made of the

23

maternal grandfather and maternal aunt, who were caring for the minor, and multiple visits by the caregiver, multiple visits by the social worker where the caregiver and the minor on her own were conducted. At no time did the minor express feeling unsafe with the caregiver at that time, who is the maternal grandmother or the maternal aunt who was residing in the maternal grandmother's home."

"I do not believe the father's JV-180 meets the criteria for the first prong of change in circumstances. It is changing circumstances, and I do not believe it would be in the best interest of the child as well for the reasons stated on the record by county counsel and minor's counsel, and for those reasons, the father's JV-180 are denied."

The court then proceeded to the section 366.26 hearing. Father's counsel argued the court should apply the beneficial relationship exception to termination of parental rights: "Father loves his child, and wants to reunite and be with her. She recognizes him as Father, and she understands his place in her life, and it would be . . . detrimental if Father's parental rights were terminated. It would be a severe blow to this child if he no longer is the father to this child, and his parental rights are terminated."

Mother's counsel similarly argued the court should apply the beneficial relationship exception to termination of parental rights: "The child cries when she's—when she has to leave Mom, and the child is of sufficient age to recognize that she . . . is, in fact, her mother." The department and minor's counsel argued that the court should find minor adoptable and terminate parents' parental rights.

Referencing *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), the court found "that both parents participated in visitation and maintained regular contact sufficient to meet prong one of the analysis."

With respect to the second prong, the court noted that minor had "spent the last half of her life away from the parents. She spent the first half of her life with her parents at an age that would indicate from all the visitation that she does recognize both Mother and Father as her parents." "The child would have some challenges after some of the visits of readjusting to the home, which does not show a positive attachment to this Court, and then the Court has to look at the . . . particular needs of the child, and this child at age six, Court's in agreement, needs permanency and stability in a loving and supportive home." "The Court will also note, in looking at the cases as to this particular prong, the interaction between the parents and child will always confer some incidental benefit to the child. That is not enough." The court found that any benefit to minor in maintaining her relationship with parents did not outweigh the stability provided by an adoptive home with the maternal aunt and terminated parents' parental rights.

## II. DISCUSSION

### A. Beneficial Relation Exception

Mother contends the court erred in declining to apply the beneficial relationship exception to termination of her parental rights. We disagree.

"[T]he goal at the section 366.26 hearing is 'specifically . . . to select and implement a permanent plan for the child.' [Citations.] To guide the court in selecting

the most suitable permanent arrangement, the statute lists plans in order of preference and provides a detailed procedure for choosing among them. [Citation.] According to that procedure, the court must first determine by clear and convincing evidence whether the child is likely to be adopted. [Citation.] If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan. [Citation.] As we have previously explained, '[t]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C.*, *supra*, 11 Cal.5th at pp. 630-631.)

"The exception at issue in this case is limited in scope. It applies where '[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' [Citation.] From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) It is the parent who must prove all three elements by a

preponderance of the evidence; the parent must "show a '*compelling* reason for determining that termination would be detrimental to the child . . . .'" (*Id.* at p. 635.)

Here, mother notes that the court expressly found that she satisfied the first prong, regular visitation and contact. The department agrees. Thus, we address only the beneficial relationship and detriment prongs.

1. Beneficial Relationship.

Mother contends the court erred in finding that she and minor did not share a beneficial relationship. Father joins. We agree.

On the second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) Courts "assess whether 'the child would benefit from continuing the relationship.' [Citation.] Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id.* at p. 632.) "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child, . . ." (*Ibid.*)

We review whether there is a beneficial relationship for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 639; *In re I.E.* (2023) 91 Cal.App.5th 683, 691; *In re Dy.P.* (2022) 76 Cal.App.5th 153, 165.)

Insufficient evidence supports the court's finding that mother did not establish her burden of proving that minor had a substantial, positive, emotional attachment to mother, such that minor would benefit from continuing the relationship. First, as the record supports, mother maintains, the department concedes, and the juvenile court below found, mother maintained regular visitation with minor.

Second, the department consistently described mother's visitation in positive terms. Minor was excited and happy to see mother. Mother engaged in age-appropriate conversation and played with her. Minor had difficulty separating from mother during a visit. The social worker indicated that minor was bonding with mother. Mother lovingly, positively, and appropriately interacted with minor. She was very attentive toward minor and ensured minor's needs were met. (*A.M.*, *supra*, E084059.)

Minor told mother, "'You'll always be my mom. and you will always be in my heart.'" During one visit, minor "became so emotional that she said while crying, 'I just want to be with my mommy.' This caused the mother to break down in tears and tell the child that she wanted to be with her, too."

Third, minor testified that she loved mother. Fourth, minor's counsel observed, "I do want to recognize that this is clearly a mother who loves her child very much, and I believe [minor] loves her mother as well." (*A.M.*, *supra*, E084059.) Fifth, the therapist who conducted the bonding study opined, there was a "strong bond between the child and mother." Sixth, mother had custody of minor for the first three years of her life. (*In re E.T.* (2018) 31 Cal.App.5th 68, 77 (*E.T.*) [the minors had spent almost half their lives

28

with the mother].)  Seventh, mother at one point moved to unsupervised visitation.  Thus, insufficient evidence supports the court's determination that mother and minor did not have a beneficial relationship.

2.  Detriment

Mother contends the court abused its discretion in determining that termination of parental rights would not be detrimental to minor.  We disagree.

"[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home.  [Citation.]  By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship.  [Citations.]  What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.)  "[T]he question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.)

"[W]hether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)  "A court abuses its discretion

29

only when "''the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.''" [Citation.] But "'[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'''" (*Id.* at p. 641.)

The court acted within its discretion in concluding it would not be detrimental to minor to terminate mother's parental rights. At the time of the section 366.26 hearing, minor had lived approximately half of her life outside mother's custody. The department placed minor with the maternal aunt and uncle in Minnesota on December 17, 2024; thus, at the time of the section 366.26 hearing, minor had been out of state in the prospective adoptive parents' home for approximately 10 months.

The maternal grandmother, with whom the department initially placed minor, and who obtained de facto parent status, relocated to Minnesota, allowing her to maintain a close relationship with minor.

Minor appeared happy and well taken care of. She was loved and had all her needs met. Minor "had a bond and close relationship with the maternal aunt since she was a baby, . . . ." Minor expressed not wanting to leave the prospective adoptive parents' home. Minor stated she loved being in the maternal aunt's home.

Minor "is very stable in her placement and has adjusted extremely well. [Minor] is happy and thriving and has a strong bond with her caregivers, whom she calls 'Mommy' and 'Daddy' and sometimes 'Auntie' and 'Uncle . . . .' The caregivers continue to express their desire and commitment to providing [minor] with stability and

consistency, as well as provide her with a permanency in a loving and nurturing environment, as [minor] is unable to return to the care of the parents.  The caregivers have ensured that [minor's] immediate medical, social, developmental, emotional, and physical needs are being met abundantly."

"Additionally, [minor] loves helping the maternal aunt with taking care of, playing with, and entertaining her twin cousins.  She has expressed that they are like little sisters to her.  Further, the maternal grandmother, [other] maternal aunt, . . . and her four-year-old son have relocated to Minnesota nearby [minor's] placement home.  [Minor] has been able to maintain her lifelong connections with her maternal grandmother, maternal aunt, and cousin through this placement change."

Thus, mother failed to make a compelling showing that the loss of the minor's relationship with her would harm minor to an extent not outweighed, on balance, by the security of a new, adoptive home with the prospective adoptive parents.  Therefore, the court acted within its discretion in determining the circumstances were not exceptional, such that it should not terminate mother's parental rights.

B.  Father's Issues

As noted in footnote 2 *ante*, we agreed to address father's claims in his supplemental brief to the extent he was contending that appellate counsel had been prejudicially ineffective in declining to raise those issues.  Father maintains the court wrongfully bypassed his reunification services.  Father contends he was denied structural due process when he received no notice of the hearing on April 21, 2025, only one day's

31

notice on June 6, 2025, and was denied "every procedural right available to him" at the hearing on October 27, 2025. Father asserts the court's reduction in his visitation with minor also violated his due process rights. Additionally, father argues the maternal grandfather now recants an allegation he had made that he had personally observed father assault mother in January 2023.[14] Father argues the social worker's pattern of misconduct denied him a fair proceeding. Finally, father contends the beneficial relationship exception applied to him. We find no error.

"A parent in a dependency proceeding is entitled to competent counsel and to judicial review of claims of ineffective assistance of counsel. [Citation.] A parent seeking to establish ineffective assistance of counsel must show both that counsel failed to act in a manner to be expected of a reasonably competent attorney practicing in the field of juvenile dependency law, and that it is "'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" [Citation.] When a parent seeks to assert ineffective assistance of counsel on direct appeal (as opposed to by writ of habeas corpus), appellate courts further limit their review to consider only those claims "'where 'there simply could be no satisfactory

---

[14] The purported recantation is of no legal significance because the record does not disclose that the maternal grandfather ever actually made such an allegation. Rather, it was the maternal *grandmother* who informed the social worker on January 8, 2023, that father had physically assaulted mother the prior night. (*A.M.*, *supra*, E084059.) Moreover, the recantation consists only of a copy of an email; thus, it has no evidentiary value. (*Safieddine v. MBC FZ, LLC* (2024) 103 Cal.App.5th 1086, 1094, fn. 9 ["A declaration not signed under penalty of perjury under the laws of California has 'no evidentiary value' and can be disregarded. [Citation.]"].)

explanation' for . . . counsel's action or inaction."' [Citation.]" (*In re M.F.* (2022) 74 Cal.App.5th 86, 108-109.)

### 1. Reunification Services

"[A]n unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order." [Citation.]' [Citations.]" (*In re S.B.* (2009) 46 Cal.4th 529, 532.) "'Failure to file a petition for extraordinary writ review within the period specified by rule, . . . shall preclude subsequent review by appeal of the findings and orders made pursuant to [section 366.26.]' [Citation.]" (*In re Hannah D.* (2017) 9 Cal.App.5th 662, 678.)

Father failed to file an appeal from the order terminating his reunification services on October 24, 2023. Thus, we lack jurisdiction to consider whether the court's order terminating father's reunification services was erroneous. (*In re A.R.* (2021) 11 Cal.5th 234, 253 ["failure to promptly seek relief 'may . . . preclude review of claims of ineffective assistance of counsel,' since '[n]owhere is timeliness more important than in a dependency proceeding where a delay of months may seem like "forever" to a young child'"].)

Moreover, even if we could address father's challenge, it would fail. Father received 12 months of services. The reports prior to the court's order terminating father's services reflect that father had not been cooperative, had not completed any case plan services, and had not even initiated any service to which he had been referred. Father failed to take any responsibility for the family's circumstances and placed all culpability

on mother. (*A.M.*, *supra*, E084059.) Thus, the court properly terminated father's reunification services.

2. Due Process Issues

Father contends he was denied structural due process when he received no notice of the hearing on April 21, 2025, only one day's notice of the hearing on June 6, 2025, and was denied "every procedural right available to him" at the hearing on October 27, 2025.

"Due process during a dependency hearing generally requires that parents be given the right to present evidence, to cross-examine adversarial witnesses, and for counsel to be provided the opportunity to argue the merits of an issue. [Citation.]" (*In re L.J.* (2023) 89 Cal.App.5th 741, 753-754.) "We review de novo whether inadequate notice violated a parent's due process rights. [Citation.]" (*In re Jayden G.* (2023) 88 Cal.App.5th 301, 308.)

Father and his counsel appeared at a hearing at which the court confirmed the hearing for April 21, 2025, and dispensed "with further statutory notice to both Mother and Father, who are present at this point in time." On April 15, 2025, the department notified father by mail of the hearing scheduled for April 21, 2025. Father's counsel appeared at the hearing. Thus, father was properly notified of the April 21, 2025, hearing.

Likewise, father and his counsel were properly, orally notified by the court on February 18, 2025, for the hearing on "June 6, 2025. All parties are ordered to return

34

without further notice on that date." Father's counsel appeared at the hearing. Thus, father had months of notification for the hearing.

With respect to the October 27, 2025, hearing, the department notified father of the hearing by mail on September 10, 2025. Father, represented by counsel, appeared at the hearing. Thus, father, who actually appeared at the hearing and was represented by counsel, was not deprived of due process. Father had every opportunity to testify at the hearing but did not so avail himself.

Finally, defendant fails to support his argument that the court violated his due process rights by reducing his visitation with any pertinent or cognizable legal argument. Thus, the issue is deemed abandoned. (*Landry v. Berryessa Union School Dist*. (1995) 39 Cal.App.4th 691, 699-700.) Father also failed to appeal that order. Therefore, father was not denied due process of law.[15]

3. Beneficial Parental Relationship Exception

We rejected mother's contention that the court erred in declining to apply the beneficial relationship exception to termination of parental rights. Although we would agree that father visited with minor consistently and positively, father had far less

---

[15] Father's claim that the social worker's pattern of misconduct denied him a fair proceeding partially involves the notice complaints rejected *ante*. Father also complains about the social worker's cancellation of visitation between he and minor. However, the cancelled visits appear to have occurred because the social worker texted father several times to schedule virtual visits but never received a response. Father contends the social worker failed to document the allegations of abuse against minor by the maternal aunt, but the social worker did document allegations that the maternal aunt spanked minor. The court found the department took those allegations seriously and investigated them; they were deemed unfounded.

visitation with minor, was not even living with minor for 18 months prior to the dependency proceedings, did not participate in reunification services, and had his services terminated six months earlier than mother. Thus, any assertion that the court erred in declining to apply the beneficial relationship exception to termination of father's parental rights is unavailing, especially when compared with mother's rejected claim. Therefore, father's appellate counsel did not render ineffective assistance of counsel in declining to raise the issues father presents.

### III. DISPOSITION

The court's orders terminating parents' parental rights are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

FIELDS
J.